# IN THE SUPREME COURT OF THE STATE OF IDAHO

## Docket No. 38823-2011

| | | |
|---|---|---|
| JUDY NIELD, | ) | Idaho Falls, November 2012 Term |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | 2014 Opinion No. 20 |
| v. | ) | |
| | ) | Filed: February 18, 2014 |
| POCATELLO HEALTH SERVICES, INC., a | ) | |
| Nevada corporation, d/b/a Pocatello Care and | ) | Stephen W. Kenyon, Clerk |
| Rehabilitation Center, | ) | |
| | ) | *AMENDED* |
| Defendant-Respondent. | ) | SUBSTITUTE OPINION |
| | ) | |

Appeal from the District Court of the Sixth Judicial District of the State of Idaho, Bannock County. The Hon. Robert C. Naftz, District Judge.

The judgment of the district court is vacated and the case is remanded.

Cooper & Larsen, Chartered, Pocatello, for appellant. Javier L. Gabiola argued.

Duke Scanlan & Hall, PLLC, Boise, for respondent. Keely E. Duke argued.

---

BURDICK, Chief Justice.

This is an appeal from a judgment dismissing an action wherein the plaintiff sought damages for injuries sustained as a result of contracting certain infections. The district court employed a differential diagnosis analysis and held that plaintiff's medical experts were required to rule out possible sources of the infections, other than the defendant's care. The district court determined that plaintiff's medical experts' opinions were inadmissible because they did not address the other possible sources of the infections that were suggested by defendant's medical expert. We vacate the judgment and remand for further proceedings.

## I. FACTUAL BACKGROUND

This action was filed by Judy Nield to recover damages from Pocatello Health Services, Inc., d/b/a Pocatello Care and Rehabilitation Center (PCRC), due to its alleged negligence in

1

providing her with wound care, which allegedly caused her to become infected with methicillin-resistant staphylococcus aureus (MRSA) and pseudomonas aeruginosa (pseudomonas), ultimately necessitating the amputation of her lower left leg and surgery to repair her right hip implant.

On August 21, 2007, sixty-five-year-old Nield was taken to the emergency room at Portneuf Medical Center (PMC) for pain and swelling in her left leg and pain in her right hip. She had had a bilateral hip replacement in 1994, and since then she had a lack of feeling in her left leg below the knee. In 2005, she dislocated her left hip in a fall, but it went undiagnosed and she continued ambulating by using a cane or walker. In April 2007, her pain increased to the point that she began using a wheelchair. She developed open sores on her lower left leg, and a nurse visited her home to assist with dressing changes. By August 21, Nield's pain was so severe that she could not get out of bed, resulting in her trip to the emergency room. It was noted that she presented "with worsening oozing and redness of her left lower extremity." Upon admission, she was "placed on contact isolation in case she had MRSA." She was administered intravenous antibiotics and wound and blood samples were collected. A laboratory report of a sample collected on August 21, 2007, from "WOUND, LEFT LEG" did not reveal either MRSA or pseudomonas.

On August 23, 2007, a physician was consulted regarding Nield's cellulitis and right hip pain. He noted that "[s]he has a fair amount of cellulitis and open blistering of her left lower extremity" and "[s]he has much less cellulitis and open areas on the right leg but has fair amount of pain both laterally and anteriorly with range of motion of her hip." The physician ordered an aspiration of her right hip to check for infection, but noted: "Unfortunately the results of this aspiration are going to be compromised because of starting the antibiotics. However, if we obtain a considerable amount of white blood cells we can assume that the hip is infected." An aspiration of her right hip was done on August 23, 2007. The laboratory report stated that no organisms were seen after 48 hours. Nield was discharged from the hospital on August 25, and the discharge summary stated that "an aspiration of the right hip showed only white blood cells but did not grow any bacteria." The discharge summary ends with a handwritten note by Dr. Ryan Zimmerman—"MRSA screen negative."

That same day, Nield was admitted to PCRC for the purpose of healing the sores on her left leg so that she could undergo surgery to repair her hip implants. She had four open wounds on her lower left leg that were to be treated. The wounds were on her left ankle, her left shin, the top of her left foot, and the back of her left calf. Upon her admission, she was not screened for either

2

MRSA or pseudomonas.

A laboratory report of a sample collected on November 9, 2007, from "WOUND, LEFT LEG" revealed both moderate MRSA and moderate pseudomonas. She was placed on intravenous antibiotics and completed that treatment on November 25, 2007. A laboratory report of a sample collected on November 27, 2007, from 'WOUND, LEFT LEG" revealed light MRSA and did not reveal pseudomonas. She was then placed on another antibiotic. On December 3, 2007, she left PCRC because her Medicare coverage was expiring.

Nield returned home where she remained until March 20, 2008, when she was admitted to PMC because of a MRSA infection in her left foot that had spread to her ankle bone. She was transferred to a hospital in Utah. On April 2, 2008, Nield's left leg was amputated below the knee due to the infection.

Nield filed suit against PCRC on October 1, 2009, claiming that negligent wound care and unsanitary conditions at its facility violated its duty of care, resulting in the amputation of her leg, impairment of her mobility, and attendant physical pain and suffering. On October 8, 2010, PCRC moved for summary judgment on the ground that Nield could not prove that the MRSA and pseudomonas infections she contracted were caused by its negligence. PCRC supported this motion with the affidavit of Dr. Thomas Coffman, a physician who was board certified in both internal medicine and infectious disease.

Among other things, Dr. Coffman stated:

(a)   MRSA is not more virulent than other strains of staphylococcus.

(b)   A person may be colonized with MRSA but not show signs or symptoms of infection.

(c)   MRSA can be found in health care facilities and outside of health care facilities. MRSA is ubiquitous within skilled nursing facilities and long term facilities.

(d)   MRSA can be transmitted in many ways, including contact with someone who has an active infection, contact with someone who is MRSA colonized but not infected, contact with an object that has been contaminated with MRSA, or breathing in droplets expelled by a MRSA carrier or infected person expelled during breathing, coughing or sneezing.

(e)   A resident at a skilled nursing facility such as [PCRC] can become MRSA colonized or infected despite strict adherence to an appropriate infection control policy.

(f)   Wound and fluid cultures are one way to determine if a person is infected with MRSA or pseudomonas.

(g)   People may also be screened for MRSA to identify individuals who are MRSA colonized. . . . I have not seen any records of MRSA screening for

3

Ms. Nield prior to her admission to [PCRC]. I note that the August 25, 2007 discharge summary from [PMC] includes a handwritten note that a MRSA screen was negative. . . . However, there are no records of any MRSA screen. . . . Based upon the records, it appears Dr. Zimmerman's reference to a negative MRSA screen is referring to the culture taken of Ms. Nield's wound on August 21, 2007, and not an actual MRSA screening. Based on the lack of any MRSA screen report, it is fair to assume that a MRSA screen was not performed. If Ms. Nield was not screened for MRSA, it is not possible to determine if she was MRSA colonized at the time she was admitted to Pocatello Care and Rehab on August 25, 2007.

(h)     Like MRSA, people may be carriers of pseudomonas aeruginosa without showing any signs or symptoms of infection.

(i)     Based on the records available, it is not possible to determine with a reasonable degree of medical certainty, whether or not Ms. Nield was MRSA or pseudomonas colonized as of the date she was admitted to [PCRC].

(j)     The August 21, 2007 wound culture does not rule out the possibility Ms. Nield was colonized or infected with MRSA or pseudomonas. . . . It is possible Ms. Nield had MRSA and/or pseudomonas in her swabbed leg wound, but that the culture did not grow out and identify these bacteria, resulting in a false negative.

(k)     Based upon the records available, my knowledge experience and training, it is not possible to determine whether or not Ms. Nield was MRSA or pseudomonas colonized as of the time she was admitted to [PCRC] on August 25, 2007. As such, it is not possible to determine when, where or how Ms. Nield became infected with MRSA or pseudomonas.

Dr. Coffman offered no opinion as to whether the amputation of Nield's leg was necessitated by MRSA or pseudomonas infections.

Nield moved to strike portions of Dr. Coffman's affidavit on a number of grounds, particularly asserting that critical opinions were based on speculation. In her memorandum submitted in support of the motion to strike, Nield stated:

Dr. Coffman again asserts supposition in concluding . . . "it appears" that Dr. Zimmerman's reference in his discharge summary . . . to a negative MRSA screen refers to the culture taken, "and not an actual MRSA screening based on the lack of any MRSA screen report." Dr. Coffman goes on to speculate, "it is fair to assume that a MRSA screen was not performed." Again, Dr. Coffman speculates, and does not endeavor to produce any facts to ascertain whether a screen and culture were done.

Dr. Coffman goes on to conclude: "If Ms. Nield was not screened for MRSA, it is not possible to determine if she was MRSA colonized at the time she was admitted to [PCRC] on August 25, 2007." This is again supposition and conclusory speculation. Dr. Coffman's speculation is evident by his use of "If" indicative of his conclusory speculations.

4

Nield also responded to PCRC's summary judgment motion with the affidavits of three experts: Sidney Gerber, a nursing facility expert; Suzanne Frederick, a nursing care expert; and Dr. Hugh Selznick, a medical expert. Each of Nield's experts attributed her infections to poor infection control measures by the staff of PCRC.

Gerber submitted an affidavit, which attached and incorporated a more comprehensive report. In his report, he stated that nursing home operators must:

> Establish and maintain an infection control program designed to provide a system that monitors, investigates, controls, and prevents the development and spread of disease and infection in the facility, and for a resident to live in a safe, sanitary, and comfortable environment.

Based on his review of PCRC records, as well as survey findings by the Idaho Department of Health & Welfare (IDHW) regarding complaints against PCRC, Gerber opined that PCRC did not comply with applicable safety and hygienic standards. Among other things, he stated:

> According to the [IDHW] survey conducted on January 24, 2008, [PCRC] failed to implement its own policies and procedures regarding proper wound care technique according to accepted standards of practice to prevent the spread of infection. Repeatedly, surveyors observed nurses failing to use proper wound care, i.e. using basic universal precautions of washing or sanitizing their hands while providing treatment to two facility residents, one of which was admitted to the facility with MRSA (Methicillin-resistant Staphylococcus aureus). . . . Although Ms. Nield was not one of the residents surveyed, she was discharged home on 12/3/07 with MRSA . . . .

Frederick, the nursing care expert, submitted both an affidavit and a more comprehensive report. The report does not appear in the record as an attachment to her affidavit but, rather, as an attachment to the affidavit of Nield's counsel. The report cited to PCRC's "substandard nursing practices regarding infection control," based upon her review of PCRC's records and the IDHW survey. She recites:

> During the inspections, surveyors observed nurses during wound care that failed to follow professional practice standards and facility policies and procedure to prevent infections. The facility was cited for failing to ensure residents received proper wound care according to accepted standard of practice in order to prevent the possible spread of infection. According to the survey documents, nurses repeatedly failed to wash their hands at appropriate times during the wound care procedures and failed to follow proper precautions, including with a resident that had MRSA. . . .The surveyor's description of the nursing staff's actions and breaches of the standard of care demonstrated the facility's failure to adequately train and supervise the nursing staff in order to prevent the spread of infection such as MRSA. The nurse's failure to wash hands and failure to remove soiled and contaminated gloves prior to touching items and equipment showed that the

5

nurse did not understand basic infection control principles. . . .The nursing staff failed to properly communicate the condition of Mrs. Nield's wounds to her physician and the healthcare team. The nurses failed to document Mrs. Nield's wounds completely and accurately. . . .The written record is an extremely important part of communication and the failure to maintain a complete and accurate record prevents the healthcare team from properly evaluating a resident's needs and response to treatment.

Dr. Selznick submitted an affidavit, which attached and incorporated a more lengthy report, dated September 11, 2009. Among other things, he stated in the report:

(a)  MRSA is not a community acquired staph but rather a bacteria often acquired nosocomially or as a result of hospitalization. Methicillin resistant staph is a rather virulent microbe resistant to many antibiotics, including penicillin-related methicillin. The initial staph present, per 08/21/07 wound cultures (coagulase **negative**) was a much less virulent and more susceptible organism.

(b)  There is no evidence, in my opinion, to a reasonable degree of medical certainty, that Ms. Nield had MRSA infection prior to entering [PCRC]. Objective evidence for same exists, based on her 08/21/07 left lower extremity wound cultures which confirmed coagulase **negative** staph, not MRSA, whereas subsequent cultures following her hospitalization at [PCRC] did grow out MRSA (11/09/07, 01/18/08, 03/13/08).

(c)  The provided medical records confirmed initiation of wound care at the Portneuf Wound Care & Hyperbaric clinic on 11/09/07 with treatment notes in evidence through 03/20/08. No wound cultures were done at [PCRC] from 08/25/07 until a wound culture was performed at Portneuf Wound Care & Hyperbaric Clinic on 11/09/07 initial evaluation. This wound culture grew coagulase **positive** staph, which was different from the prior coagulase **negative** staph. Sensitivity patterns confirmed this was a **methicillin resistant Staphylococcus aureus**. Additionally, the 11/09/07 wound culture grew moderate **Pseudomonas aeruginosa**.

(d)  My detailed review of the [IDHW] Summary Statement of Deficiencies, . . . confirmed a patient being treated in August of 2007 at the [PCRC] for wound care and "pseudomonas cellulitis of both knees." It is my opinion the objectively confirmed pseudomonas infection of left lower extremity wounds per 11/09/07 culture was indeed contracted at [PCRC]. In addition, allegations outlined in a 02/19/08 letter to the administrator of [PCRC] . . . confirmed, "There were four or five other residents in rooms near the identified resident with methicillin resistant staphylococcus aureus infections." The findings of the investigation confirmed and substantiated poor infection control measures by the staff.

(e)  It is highly unlikely, in my opinion, that Ms. Nield contracted pseudomonas from any other source other than from her [PCRC] hospitalization given aforementioned positive 11/09/07 culture results.

6

This is a very rare organism to cause total joint infection in general, and given the positive 11/09/07 wound culture for pseudomonas, it is more likely than not, colonization occurred while hospitalized at [PCRC] and ultimately led to her right hip demise. It should be noted that right hip aspiration at the time of her 08/21/07 admission was negative.

Prior to the hearing on its summary judgment motion, PCRC moved to strike portions of Nield's affidavits. With regard to Dr. Selznick's affidavit, PCRC sought to strike as speculative and/or without foundation one full paragraph, one sentence in another paragraph, and two sentences in a third paragraph. In addition, a statement contained in a fourth paragraph was sought to be stricken on the grounds of being conclusory. PCRC did not seek to strike any portion of two medical reports Dr. Selznick had attached and incorporated into his affidavit, consisting of approximately fifty-two pages and containing further medical opinions. PCRC sought to strike the entirety of Frederick's affidavit as being speculative and without foundation and one paragraph of Gerber's affidavit on grounds of speculation and lack of foundation. PCRC did not seek to strike the eight-page report that Gerber attached and incorporated into his affidavit, detailing standards applicable to nursing care facilities for controlling and preventing the spread of infectious diseases, including MRSA, and explaining how PCRC had failed to comply with those standards. PCRC did not seek to strike any portion of Fredrick's report either, which was submitted as an incorporated attachment to the affidavit of Nield's counsel.

The district court, rather than dealing directly with the evidentiary deficiencies asserted by PCRC, determined that Dr. Selznick's entire affidavit was inadmissible under I.R.E. 702 because it did "not contain the reasoning or methodology required to assist the trier of fact in determining whether [PCRC's] actions were a substantial factor in [Nield] contracting MRSA and pseudomonas." The court noted, however, that it did "not mean to suggest that Dr. Selznick does not possess the knowledge, skills or qualifications to address the question of causation." Although the district court mentioned the affidavits of Frederick and Gerber in its memorandum granting summary judgment, it did not analyze either of the affidavits or rule on their admissibility. However, in its memorandum ruling on Nield's motion for reconsideration, the district court erroneously stated it had conducted an analysis of those affidavits and "found [them] to be similarly insufficient in establishing where and how [Nield] contracted MRSA and pseudomonas." The district court made no mention of the reports prepared by Frederick and Gerber.

7

The district court quoted I.R.E. 702, noting that expert testimony will not be of assistance to the trier of fact and is inadmissible if it is speculative, conclusory or unsubstantiated by facts in the record. On the other hand, the court noted that if an expert's reasoning and methodology are scientifically sound and based on a reasonable degree of medical probability, the testimony will be of assistance to the trier of fact and admissible.

Because Dr. Selznick's and Dr. Coffman's opinions differed as to when and where Nield had likely contracted MRSA, the district court concluded that it was dealing with a "differential diagnosis" case, citing *Weeks v. Eastern Idaho Health Services*:

> Differential diagnosis involved an analysis of all hypotheses that might explain the patient's symptoms or mortality. After identifying all of the potential causes of symptoms, the expert then engages in a process of eliminating hypotheses in order to reach a conclusion as to the most likely cause. When using differential diagnosis a district court is justified in excluding the expert's testimony if the expert fails to offer an explanation why an alternative cause is ruled out.

143 Idaho 834, 839, 153 P.3d 1180, 1185 (2007) (citing *Clausen v. M/V New Carissa*, 339 F.3d 1049, 1057–58 (2003)).

Based on its determination that a differential diagnosis analysis was appropriate, the district court determined that Dr. Selznick's affidavit was inadmissible because it did not negate possible alternate sources through which Dr. Coffman suggested Nield may have contracted MRSA—the possibility that Nield may have been a carrier of MRSA, the possibility that the culture of her left leg wound may have produced a false negative, or "the other factors that could have been a substantial factor in causing the infections." It was apparently the district court's view that Nield's affidavits, particularly that of Dr. Selznick, were required to negate the possible sources of infection suggested by Dr. Coffman in order to be admissible under I.R.E. 702. Based on its holding that Dr. Selznick's affidavit was inadmissible, the district court stated, "there is no need for this Court to address the Motions to Strike filed by the Plaintiff." The district court apparently accepted Dr. Coffman's affidavit testimony despite Nield's objections and utilized that testimony in determining the admissibility of Dr. Selznick's testimony.

Having stricken Dr. Selznick's affidavit and assuming it had stricken the other two affidavits, the district court concluded that Nield had presented no admissible evidence to counter the statements in Dr. Coffman's affidavit and, therefore, granted summary judgment in favor of PCRC. A judgment dismissing the case was thereafter entered and it is from that judgment that Nield timely appealed.

8

## II. ISSUES ON APPEAL

1. Whether the district court erred in using a differential diagnosis analysis to determine the admissibility of Dr. Selznick's affidavit.

2. Whether the district court erred in relying upon Dr. Coffman's affidavit.

3. Whether the district court erred in using Dr. Coffman's affidavit as a yardstick for determining the admissibility of Nield's affidavits.

## III. STANDARD OF REVIEW

The summary judgment in this case was premised on the district court's determination that Nield had submitted no admissible evidence in opposition to PCRC's summary judgment motion. Thus, we are presented with an evidentiary issue. In this regard, we recently stated:

> The admissibility of evidence contained in affidavits and depositions in support of or in opposition to a motion for summary judgment is a threshold matter to be addressed by the court before applying the liberal construction and reasonable inferences rule to determine whether the evidence creates a genuine issue of material fact for trial. This Court applies an abuse of discretion standard when reviewing a trial court's determination of the admissibility of testimony offered in connection with a motion for summary judgment. A trial court does not abuse its discretion if it (1) correctly perceives the issue as discretionary, (2) acts within the bounds of discretion and applies the correct legal standards, and (3) reaches the decision through an exercise of reason.

*Gerdon v. Rydalch*, 153 Idaho 237, 241, 280 P.3d 740, 744 (2012) (internal quotation marks and citations omitted).

## IV. ANALYSIS

### A. The district court erred in using a differential diagnosis analysis to determine the admissibility of Dr. Selznick's affidavit.

The district court concluded that it was dealing with a differential diagnosis case involving several potential causes of Nield's symptoms, citing the *Weeks* case. Nield contends that the court erred in doing so and requiring that she "eliminate any other causes and show that she could have only gotten MRSA and pseudomonas from PCRC." On the other hand, PCRC asserts that, based on Dr. Coffman's affidavit, there are multiple possible sources of infection and Nield was required in her affidavits to eliminate all possible sources but PCRC.

Differential diagnosis is merely an alternate means of establishing causation where there are several potential causes of symptoms and there is insufficient scientific basis to conclusively establish any one potential cause. *Weeks*, 143 Idaho at 839, 153 P.3d at 1185. In *Weeks*, the plaintiff's medical expert was unable to determine to a "reasonable medical probability" the

9

exact effect of certain medications upon a patient's brain. *Id.* The brain injury, which resulted in the patient's death, could have been as a result of the "chemicals themselves, the volume of fluid, or the combination of the two." *Id.* The expert had no scientific studies upon which to opine as to the effect of the chemicals on the patient's brain. *Id.* However, there was scientifically reliable evidence regarding the deleterious mechanical effect on the patient's brain of increasing the intracranial pressure. *Id.* Thus, this Court held that the district court erred in failing to admit the expert's testimony into evidence even though he could not pinpoint the exact cause of the injury. *Id.* at 840, 153 P.3d at 1186. Where a specific cause of a patient's symptoms can be stated to a reasonable medical certainty, there is no place for this alternate means of establishing causation.

This Court has not had occasion to flesh out the parameters of the differential diagnosis methodology. Because of the misconceptions apparent in the district court's decision, we take this opportunity to do so. While we have not previously defined "diagnosis" in this context, we find the Black's Law Dictionary definition to be appropriate: "The determination of a medical condition (such as a disease) by physical examination or by study of its symptoms." BLACK'S LAW DICTIONARY 464 (7th ed. 1999). Some federal courts have employed a more expansive definition that incorporates "differential etiology," which is "a term used on occasion by expert witnesses or courts to describe the investigation and reasoning that leads to the determination of external causation, sometimes more specifically described by the witness or court as a process of identifying external causes by a process of elimination." *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1252 (11th Cir. 2005). Being the highest court of a sovereign state, we are free to adopt our own concept of differential diagnosis and we decline to follow the more expansive definition employed by some federal courts. In this case, only one cause of symptoms was considered by the district court—the hypothesis that MRSA and pseudomonas were the cause of Nield's injuries. Dr. Selznick flatly stated that they were the cause of her injuries, while Dr. Coffman did not directly address the issue in his affidavit. The main issues in dispute were when, where, and how Nield may have contracted the infections. Dr. Selznick opined that she could only have contracted the infections at PCRC. Dr. Coffman opined that she could have contracted the infections elsewhere and that it was impossible to determine exactly where that might have been. This dispute, however, is not one that is appropriate for resolution under a differential diagnosis analysis.

Differential diagnosis can be utilized at the evidentiary stage of a case to determine whether an expert's opinion constitutes admissible evidence. It may also be employed at the summary judgment and trial stages. In those latter stages, the expert presenting differential diagnosis evidence must do so in an adversarial setting. However, the admissibility stage is not subject to an adversarial process, such as the district court employed here. In other words, in determining whether an expert's testimony is admissible, "[t]he Court must look at the affidavit or deposition testimony and determine whether it alleges facts, which if taken as true, would render the testimony admissible." *Edmunds v. Kraner*, 142 Idaho 867, 871, 136 P.3d 338, 342 (2006). Indeed, that is what the Court did in *Weeks*. The plaintiff's expert in *Weeks* was unable to present a diagnosis stating the cause of symptoms to a reasonable medical probability, but avoided summary judgment by employing the differential diagnosis methodology. 143 Idaho at 839, 153 P.3d at 1185. The expert testimony in *Weeks* was judged, not by material contained in an opposing affidavit, but by material contained in the expert's own affidavit testimony.

Here, Dr. Selznick testified to a reasonable degree of medical certainty that Nield contracted her infections at PCRC, rather than before she was admitted there. The district court should have focused on what Dr. Selznick said in his affidavit and incorporated reports, rather than what he did not say or what Dr. Coffman said. If Dr. Selznick's opinion testimony was insufficient, that is a matter for determination in the adversarial summary judgment stage of the proceeding. The district court did not rule that Dr. Selznick was unqualified to address the issue of causation or that he lacked an adequate foundation, but rather, the court based its determination solely on the ground that he did not counter the various possibilities suggested by an opposing expert. When this Court stated in *Weeks* that a district court is justified in excluding expert testimony if the expert fails to offer an explanation as to why an alternate cause is ruled out, we were not considering the situation where an opposing expert was questioning the testimony of the plaintiff's expert. Rather, we were addressing the situation where the plaintiff's expert could not state an exact cause to a degree of medical probability, raised two possible causes, stated that one was more probable than the other but then observed that both likely played a part. The analysis in *Weeks* was confined to the matters stated in the expert's affidavit, not upon some external testimony.

Dr. Selznick opined that MRSA is an infectious disease, that it is spread by some sort of contact, that Nield did not have MRSA or pseudomonas prior to admission to PCRC, and that

she contracted the infections at PCRC as a result of its unsanitary conditions and improper wound care. Since we do know Nield's diagnosis, as presented to the district court on PCRC's summary judgment motion—infection with MRSA and pseudomonas[1]—there was no need to go further to "explain the patient's symptoms or mortality," nor was there any requirement to rule out alternate causes of those symptoms.

The district court had the mistaken conception, apparently derived from PCRC's summary judgment memorandum, that expert medical testimony was necessary "in order to establish how and where the plaintiff was infected with MRSA and pseudomonas." Expert testimony certainly can be of assistance to the trier of fact in establishing that a disease is infectious and how it might be spread or contracted. However, expert testimony is not necessary in determining how a particular person contracted the disease. That is largely a factual matter. Here, both Dr. Selznick and Dr. Coffman submitted testimony that MRSA and pseudomonas are infectious and can be spread from person to person. Dr. Selznick offered testimony as to potential sources of contracting the infection, as well as the probable source for Nield's infection. Dr. Coffman offered testimony of a variety of sources through which a person might contract an infection. All of this is within the domain of expert testimony. A layperson would not necessarily know where or how a person might contract an infectious disease.

Once the experts have opined as to the potential sources of an infection, it does not take expert testimony to establish exactly how a particular person contracted a particular infection. Fact witnesses can provide the necessary details about sanitary conditions, contact by or with the infected person, wound care received by the infected person, and the like in order to fill in the details. In this case, as set forth below, some of those details were before the district court in the testimony of Nield, Dr. Selznick, Gerber and Frederick.

PCRC contends, and the court below found, that direct expert testimony is required to show proximate cause. However, this Court held to the contrary in *Sheridan v. St. Luke's Regional Medical Center*, 135 Idaho 775, 25 P.3d 88 (2001), a medical malpractice case. In relevant part, the *Sheridan* Court stated:

---

[1] After PCRC submitted its moving papers, Nield's counsel took the deposition of Dr. Coffman. In the course of that deposition, Dr. Coffman opined that Nield may have lost her leg due to leukocytoclastic vasculitis, "an autoimmune kind of inflammatory condition." He first characterized his opinion as "speculation" but then stated, "I think it's very likely that was the cause." However, this cause of Nield's symptoms was not presented to the district court in the summary judgment proceeding and played no part in the district court's analysis. It is something, however, that certainly could have played a role in a trial of the case.

> Unlike the elements of duty and breach of duty, there is no statutory requirement explicitly stating proximate cause in medical malpractice cases must be shown by direct expert testimony. Therefore, testimony admissible to show proximate cause in a medical malpractice case, like any other case, is governed by the rules of evidence regarding opinion testimony by lay witnesses and experts under Idaho Rules of Evidence 701 and 702.
>
> Furthermore, according to our precedent, proximate cause can be shown from a "chain of circumstances from which the ultimate fact required to be established is reasonably and naturally inferable." *See Formont* [*v. Kircher*], 91 Idaho [290], 296, 420 P.2d [661], 667 [(1966)].

*Id.* at 785, 25 P.3d at 98. The Court's citation to *Formont* is of particular interest. In that case, the plaintiff had an infection in his leg that went untreated, eventually resulting in the leg's amputation. The district court found that the plaintiff's physician had breached the requisite standard of care and that proper care could have been expected to produce different results, but that there was not enough proof of proximate cause. *Formont*, 91 Idaho at 295–96, 420 P.2d at 666–67. The question on appeal was whether the trial court erred in finding that the plaintiff failed to establish that the defendant-physician's care or lack of care was the proximate cause of the loss of plaintiff's leg. *Id.* at 296, 420 P.2d at 667. The *Formont* Court reversed the district court stating the following rule in support of its decision:

> Respondent was not required to prove his case beyond a reasonable doubt, nor by direct and positive evidence. It was only necessary that he show a chain of circumstances from which the ultimate fact required to be established is reasonably and naturally inferable. [. . .] If the rule of law is as contended for by defendant and appellant, and it is necessary to demonstrate conclusively and beyond the possibility of a doubt that the negligence resulted in the injury, it would never be possible to recover in a case of negligence in the practice of a profession which is not an exact science.

*Id.* (internal quotation marks and citations omitted). Thus, the district court erred here in holding that expert medical testimony was required in order to establish how and where Nield was infected. This Court's concept of the differential diagnosis methodology does not require such a holding.

Based on its misconception that this was a differential diagnosis case, the district court concluded that Dr. Selznick's affidavit was inadmissible. According to the court:

> There is nothing in Selznick's affidavit that addresses the belief that because of the ubiquitous nature of MRSA and pseudomonas the Plaintiff may have been a carrier of MRSA and pseudomonas but was not infected at the time of her admission. Selznick does not explain why the culture of the leg wound would not

13

have produced a false negative and why Plaintiff could *only* have contracted MRSA and pseudomonas while admitted at PCRC.

> In evaluating Selznick's affidavit and viewing it in the most favorable light to the Plaintiff, the Court must conclude that the validity of Dr. Selznick's reasoning and methodology regarding how the Plaintiff contracted MRSA and pseudomonas is without merit. Selznick makes a conclusion that because the Plaintiff was negative for MRSA and pseudomonas at the time of her admission to PCRC, but then tested positive for MRSA and pseudomonas prior to her discharge, then she must have contracted MRSA and pseudomonas while at PCRC. He does not address the other factors that could have been a substantial factor in causing the infections. His conclusions are speculative, conclusory, and unsubstantiated in light of the numerous ways the Plaintiff may have contracted these infections. Dr. Selznick failed to identify all of the potential causes of symptoms, eliminating hypotheses in order to reach a conclusion as to the most likely cause.

The district court erred in determining that Dr. Selznick's affidavit was inadmissible because it did not eliminate every potential alternate source of Nield's infections.

**B. The district court erred in relying upon Dr. Coffman's affidavit.**

It is clear that the district court relied upon statements contained in Dr. Coffman's affidavit in making the determination that Dr. Selznick's affidavit was inadequate. Dr. Coffman stated that there were a number of ways a person could become colonized or infected by MRSA and pseudomonas. In ruling on the admissibility of Dr. Selznick's affidavit, the district court utilized some of Dr. Coffman's statements—that Nield could have been a carrier of MRSA and pseudomonas, that the 8/21/07 leg wound culture could have produced a false negative and that it was "very possible MRSA and/or pseudomonas were present in the wound that was cultured on August 21, 2007." These three opinions were all based upon Dr. Coffman's supposition that no MRSA screen was performed prior to Nield's admission to PCRC on August 25, 2007. He states that without a screen for MRSA it is not possible to determine if she was MRSA colonized at the time of admission.

Nield filed a motion to strike these statements, contending that they were speculative. She requested that the district court either strike or disregard them. The district court makes mention of the motion to strike the affidavit of Dr. Coffman in the preface of its summary judgment decision, but the decision contains no analysis whatsoever regarding the objections raised to admission of any of his testimony. Indeed, the district court stated that it need not address the motion to strike, having granted summary judgment to PCRC. In its subsequent decision denying reconsideration, the district court states it "correctly determined that the Defendant's expert, Dr.

14

Coffman, presented admissible, credible testimony establishing that the Plaintiff could not demonstrate to a reasonable degree of medical certainty when, where, or how she contracted MRSA or pseudomonas." However, the record contains no support for the district court's assertion that it had ruled on the admissibility of Dr. Coffman's affidavit testimony.[2]

It is axiomatic that objected-to evidence may not be admitted before the objection is considered and determined. As this Court has frequently held:

> Evidence presented in support of or in opposition to a motion for summary judgment must be admissible. *Hecla Min. Co. v. Star-Morning Min. Co.*, 122 Idaho 778, 785, 839 P.2d 1192, 1199 (1992). This threshold question of admissibility of evidence must be decided "before proceeding to the ultimate issue, whether summary judgment is appropriate." *Ryan v. Beisner*, 123 Idaho 42, 45, 844 P.2d 24, 27 (Ct. App. 1992).

*Bromley v. Garey*, 132 Idaho 807, 811, 979 P.2d 1165, 1169 (1999). Or, as stated in *Ryan v. Beisner*:

> [I]f the admissibility of evidence presented in support of or in opposition to a motion for summary judgment is raised by the court on its own motion or on objection by one of the parties, the court must first make a threshold determination as to the admissibility of the evidence before proceeding to the ultimate issue, whether summary judgment is appropriate.

123 Idaho at 45, 844 P.2d at 27. The district court erred in failing to rule upon Nield's objections to statements contained in Dr. Coffman's affidavit before relying upon those statements to decide the admissibility of Nield's affidavits. "A trial court's failure to determine the admissibility of evidence offered in connection with a motion for summary judgment is error that may not be remedied on appeal." *Montgomery v. Montgomery*, 147 Idaho 1, 6, 205 P.3d 650, 655 (2009).

Even assuming that the district court had done what it said it did in the decision on reconsideration—actually ruled upon the admissibility of Dr. Coffman's affidavit before striking Dr. Selznick's affidavit and deciding the motion for summary judgment—Dr. Coffman's opinions that depend upon the failure to conduct an MRSA screen are speculative and inadmissible. "Expert opinion which is speculative . . . is inadmissible as evidence." *Weeks*, 143 Idaho at 838, 153 P.3d at 1184. Although Nield did not specifically raise on appeal the district court's failure to act upon the motion to strike portions of Dr. Coffman's affidavit, she submitted substantial argument in her opening brief on appeal that Dr. Coffman's testimony was

---

[2] PCRC harbored the misconception that the district court had actually ruled on the admissibility of Dr. Coffman's affidavit. It entitled a two-page section of its appellate brief, "The District Court did not abuse its discretion in holding Dr. Coffman's testimony was admissible."

speculative and should have been disregarded. This was the same basis upon which she based her motion to strike. Thus, we will consider the issue.

As noted above, Dr. Coffman based the above-mentioned opinions upon his conclusion no MRSA screen had been performed prior to Nield's admission to PCRC on August 25, 2007. Dr. Coffman states in his affidavit that, "[b]ased upon the *records available,* it is not possible to determine with a reasonable degree of medical certainty, whether or not Ms. Nield was MRSA or pseudomonas colonized as of the date she was admitted to [PCRC]." (emphasis added). Among the records actually reviewed by Dr. Coffman was a handwritten note on the August 25, 2007 discharge summary saying "MRSA screen negative." Although Dr. Coffman stated that it was not common practice as of that time to screen incoming patients for MRSA, it appears from his affidavit that this would have been an effective means to determine whether Nield was MRSA colonized at the time. He states: "If Ms. Nield was not screened for MRSA, it is not possible to determine if she was MRSA colonized at the time she was admitted to the [PCRC] on August 25, 2007." The opposite would appear to be true. His opinion that she was not screened is based on his speculation that the discharge summary note did not mean what it said—"MRSA screen negative." He concluded that the note was wrong because he did not find a report of the screen in the records he received for review. He says it is "fair to assume that a MRSA screen was not performed," merely because he did not find one. This is pure speculation. Thus, his contentions—that Nield was not MRSA colonized at the time she went to PCRC, that she may have produced a false negative on the culture that was documented in the record, and that she may have been an MRSA carrier—all of which played a significant part in the district court's decision to strike Dr. Selznick's affidavit, are based upon his guess that the note in the file was incorrect in stating that an MRSA screen had been performed and came out negative. A simple telephone call to Dr. Zimmerman, the author of the note, might have sufficed to definitively answer the question.

Nield further contends that Dr. Coffman's testimony is speculative because he could neither rule in, nor out, any particular source of Nield's infections. That is, although he postulated quite a number of potential sources of the infections, he could not state that she contracted the infections from any of the possible sources. "An expert opinion that merely suggests possibilities, not probabilities, would only invite conjecture and may be properly excluded." *Slack v. Kelleher,* 140 Idaho 916, 923, 104 P.3d 958, 965 (2004). Further, while Dr.

16

Coffman lists the various possible sources of infection, he does not state in his affidavit that evidence in the record supports the application of any particular possibility. In other words, Dr. Coffman opines that a person can contract MRSA through contact with someone who has an active infection, someone who is MRSA colonized but not infected, contact with an object that has been contaminated with MRSA, or breathing in droplets expelled by an MRSA carrier. However, he fails to cite to any evidence in the record indicating that Nield had contact with any of these potential sources. There is nothing in his deposition indicating that he was aware of any contact that Nield had during her stay at PCRC with visitors, staff, other residents, or anyone else. He fails to show in his affidavit that any of the possibilities are founded upon or related to actual facts in the record.[3] Further, he contends that MRSA is ubiquitous in skilled nursing facilities and long-term care facilities but not does point to any evidence in the record that this is the case with respect to PCRC. Indeed, in his deposition testimony, he seems to testify somewhat to the contrary:

> Q.    [Nield's counsel] Did, in your opinion in reviewing all the documents, PCRC violate their infection control policy and procedure?
>
> A.    [Dr. Coffman] In what respect?
>
> Q.    With respect to the prevention of transmission of MRSA and pseudomonas.
>
> A.    Well, we don't—I don't think we have any evidence of transmission of those bugs. In fact, I think in that Health and Welfare thing they referenced a report that is probably somewhere in those two big boxes—although I'm not sure of that—that they didn't have any other cases appear during this time span.
>
> They had some cases that—of people that came in with MRSA, but no—if I'm reading that state report properly, there weren't any other cases that were identified after admission, with the exception of Ms. Nield.

In this regard, we have often held that "expert opinion that is speculative or unsubstantiated by facts in the record is inadmissible because it would not assist the trier of fact to understand the evidence or determine a fact that is at issue." *Karlson v. Harris*, 140 Idaho 561, 565, 97 P.3d 428, 432 (2004).

---

[3] This brings up the question of what documents Dr. Coffman may actually have reviewed. Although he received two boxes of records and attached a list of the documents contained in those boxes to his affidavit, when asked at his deposition if the list of documents in his affidavit was a "current list of the documents that you've received and reviewed in this case," Dr. Coffman replied, "It looks like it, yes. I would say received. I obviously haven't reviewed all of these, but I received them." Nowhere does he explain what documents he did not review so it is impossible to determine what his knowledge of Nield's case actually is.

In sum, it was error for the district court to fail to address Nield's objections to Dr. Coffman's affidavit before utilizing that affidavit for any purpose in the proceedings.

**C. The district court erred in using Dr. Coffman's affidavit as a yardstick for determining the admissibility of Nield's affidavits.**

Rather than evaluating Dr. Selznick's affidavit on its own merits, the district court utilized Dr. Coffman's affidavit as the yardstick against which Dr. Selznick's opinions were measured. Because Dr. Selznick did not respond to or rebut every contention in Dr. Coffman's affidavit, the district court determined that Dr. Selznick's affidavit did not measure up to the Rule 702 standard. While an affidavit certainly needs to meet the requirements set out in Rule 702 and the case law decided thereunder, there is no requirement that an expert's testimony must comply with any standard set out in another expert's testimony. An expert's opinion testimony should be judged on its own merits in determining admissibility and not upon what some other expert claims to be the correct standard.

The district court appears to have granted full credibility to the opinions expressed by Dr. Coffman, despite the fact that the court had made no determination regarding the admissibility of his affidavit testimony and despite the speculative nature of his testimony. Even if Dr. Coffman was the gold standard, it was inappropriate for the district court to use his affidavit as the yardstick to measure Dr. Selznick's testimony or to conclude that, in order to be admissible, Dr. Selznick's affidavit had to counter every statement contained in Dr. Coffman's affidavit. Admissibility of expert testimony does not depend on how many opinions the expert gives. It is the quality of the opinions that counts. A medical expert need not address every opinion stated by an opposing expert in order for his affidavit to comply with I.R.E. 702. Once evidence is admitted, it may be insufficient to overcome an opposing party's summary judgment motion but that is the time for judging whether the expert has covered all of the bases.

In determining whether to admit affidavit testimony, the court must determine whether the affidavit alleges facts, which if taken as true, would render the testimony admissible. *Dulaney v. St. Alphonsus Reg'l Med. Ctr.*, 137 Idaho 160, 163, 45 P.3d 816, 819 (2002). Further:

> In determining whether expert testimony is admissible, a court must evaluate the expert's ability to explain pertinent scientific principles and to apply those principles to the formulation of his or her opinion. Admissibility, therefore, depends on the validity of the expert's reasoning and methodology, rather than his or her ultimate conclusion.

18

*Coombs v. Curnow*, 148 Idaho 129, 140, 219 P.3d 453, 464 (2009) (internal citation omitted). A qualified expert may testify in opinion form where his or her scientific or specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue. I.R.E. 702. Nothing in these rules requires that an expert's opinion testimony, in order to be admissible, must be compared to or measured against testimony submitted by an opposing expert.

When evaluating Dr. Selznick's affidavit testimony, including his appended and incorporated reports, it appears that he reviewed a myriad of records pertaining to Nield's care, and drew medical conclusions based on the records and his medical knowledge and experience. In addition, it should not be forgotten he was Nield's treating physician at times. The district court appears to have found him qualified to testify as an expert. Dr. Selznick stated opinions that are beyond the knowledge of a lay jury and which would certainly have been of assistance in determining some of the facts at issue in the case. For instance, in his September 17, 2009 report Dr. Selznick stated that "MRSA is not a community acquired staph but rather a bacteria often acquired nosocomially or as a result of hospitalization." Nosocomial is defined as "of or being in a hospital or medical facility; esp., of a hospital-acquired disease or infection." WEBSTER'S NEW WORLD DICTIONARY 927 (3rd College Ed. 1988).[4] In other words, MRSA is not a staph that one generally acquires out in the community, but one that is often acquired in a hospital or medical facility. Other facts or opinions stated by Dr. Selznick in his affidavit, which would be beyond the knowledge of, and of assistance to, a lay jury are: that MRSA is a rather virulent[5] microbe resistant to many antibiotics; that MRSA and pseudomonas are communicable and may be spread due to poor infection control practices; that PCRC had poor infection control practices; that Nield's medical records indicated she was not colonized with MRSA and pseudomonas when she was admitted to the PCRC on August 25, 2007; and that a culture obtained on November 9, 2007, while Nield was hospitalized at PCRC, disclosed she was infected with MRSA and pseudomonas; and that MRSA and pseudomonas were the cause of Nield's

---

[4] In his deposition, when asked if nosocomial refers to a hospital or facility-acquired strain of MRSA, Dr. Coffman responded: "They're calling them health care associated now, rather than nosocomial, because they want to include nursing homes, dialysis centers, you know, Elks Rehab, doctors' offices, you know." He asserted that a community-associated strain of MRSA, which is less resistant to antibiotics than the hospital-associated strain, is becoming more prevalent. On the other hand, Dr. Coffman states in his affidavit that MRSA is "ubiquitous within skilled nursing facilities and long term care facilities." This would certainly implicate acquisition of the infection at a facility like PCRC.

[5] In this regard, Dr. Selznick's opinion differs to an extent from Dr. Coffman's. Dr. Coffman indicated that "MRSA is not more virulent than other strains of staphylococcus." A medical publication attached to Dr. Coffman's witness disclosure indicates that the relative virulence of MRSA is a controversial issue.

symptoms and injuries. Even if one objects to his ultimate conclusion that Nield contracted both infections at PCRC, these facts would certainly have been of assistance to the trier of fact. So, too, would the reports of Gerber and Frederick regarding the standards applicable to nursing care facilities for prevention and control of infectious diseases and the fact that such practices were not being observed by PCRC. Again, while one may quibble as to the admissibility of the ultimate conclusions made by Gerber and Frederick regarding the source of Nield's infections, information as to sanitary practices and requirements for preventing infection and whether or not they are being observed would certainly be helpful to the trier of fact. Flat-out exclusion of the testimony of these witnesses was not appropriate, particularly because PCRC did not seek it. PCRC specified certain testimony that it wished to have excluded. Instead of responding to PCRC's surgical approach, the district court threw out the entire affidavit of Dr. Selznick without considering whether some of his testimony may have been admissible. The court apparently intended to do likewise with the affidavits of Gerber and Frederick, as indicated in its statement in the memorandum on reconsideration, but does not appear to have analyzed those affidavits or actually ruled upon their admissibility.

As previously noted, the issue here is not ruling out potential diagnoses, but determining the source of the infections that caused Nield's injuries. There is no dispute as to the diagnosis at issue in the proceedings below—MRSA and pseudomonas infections causing certain injuries. The question to be determined at trial is the source of the infections. Dr. Coffman's affidavit contains information as to potential sources. So do the affidavits of Dr. Selznick, Gerber and Frederick. Lay testimony can fill in the gaps.

In this regard, it might be noted that PCRC's Infection Control Policy and Procedure Manual states: "Hand washing is generally considered the most important single procedure for preventing nosocomial infections." Nield testified, as follows, about complaints she made of the wound care she received at PCRC:

Q.    [PCRC's counsel] And what are those complaints?

A.    [Nield] Those complaints were, number one, they did not wash their hands when they came into the room. A lot of them didn't.

Q.    All of the time or some of the time?

A.    Yeah. It was a regular—yeah. It was a regular thing with them. They would not wash their hands. I would even tell them, "Hey, before you touch me, for my health and your health, wash your hands, you know."

20

Q.   Would they wash then?

A.   Sometimes they would, sometimes they wouldn't.

Q.   Any other complaints?

A.   Yeah. They wouldn't put gloves on to change the wound.

Q.   Ever?

A.   Some nurses did; some didn't. And I'd say, "You better put gloves on, you know. "Oh, it's okay. It's okay." I said, "No, it's not okay, because you're going to either infect me or you're going to get infected or something. You need to put gloves on.

"Oh, it's too hard to wrap all of that stuff with gloves on, you know." It was amazing. I thought, I don't believe that you would jeopardize your life and my life because you don't like to wear gloves, because it's too hard to put a bandage on. And I would, you know, mention it to the nurses. And they'd go, "Oh, yeah, it happens all the time here."

Q.   What percentage of time were people not washing their hands?

A.   I would say probably a 60 percent chance that they weren't.

Q.   And then what about not gloving up?

A.   Not gloving up? Probably about 60.

Thus, the medical experts lay the groundwork for how these infections can spread. It is not necessary to have expert testimony to establish how the infections may actually have been acquired by a particular patient. On remand, the jury can consider the expert opinions and fact testimony to determine the causation of Nield's infections and consequent injuries.

## V. CONCLUSION

The district court abused its discretion by admitting Dr. Coffman's affidavit in evidence without first considering and ruling upon the objections to its speculative nature, by using Dr. Coffman's affidavit as the standard by which to determine the admissibility of Dr. Selznick's affidavit, by excluding the entire affidavit of Dr. Selznick, and by failing to consider and rule upon the admissibility of the Gerber and Frederick affidavits and reports. Further, the court erred by requiring Nield to negate any possible source of her infections other than PCRC. Therefore, we vacate the judgment and remand the case for further proceedings consistent with this opinion. Costs on appeal are awarded to Nield.

21

Justice W. JONES, specially concurring:

It is with some dismay and regret that I write this separate opinion solely to respond to what I consider the scurrilous and unfounded personal attacks upon the integrity and motivations of the majority in this case, which includes me. Although I feel that such personal attacks are totally inappropriate in a judicial opinion and am torn by whether such attacks even merit or justify a response, after weeks of reflection and mixed feelings, I feel compelled at least briefly to respond.

First, the dissent by Justice Eismann accuses the majority of lying, misrepresentations and falsification of the record based solely on the misguided belief that the majority for some unexplained reason wants the plaintiff in this case to "win." Speaking solely for myself in this separate opinion, I can assure the reader that at least on my part nothing could be further from the truth, and I firmly believe that is true of the other justices as well. It is astounding and beyond belief to me, who has spent nearly 45 years of my life as an insurance defense attorney battling plaintiffs in personal injury cases, that now I should be castigated for some unexplained reason that I want the plaintiff to "win" this case. Such an assertion is beyond ludicrous. I took a vow when I took this office to decide cases based on the law and legal reasoning. I am proud of my record and invite any reader to research the opinions I have written over the past six plus years and they will see that there is no pattern or indication whatsoever that my opinions favor either the plaintiff or the defense. I am deeply saddened and offended by such unfounded, unsupported allegations. There is not a shred of evidence to support such allegations, apart from the fact that they are totally inappropriate and unfounded in a judicial opinion. I am sad that Justice Eismann's dissenting opinion lowers itself to personal attacks more suited to a school yard argument among teenagers than to a professional legal discourse that should be expected in a judicial opinion.

I can certainly respect the dissenting opinion of Justice Horton, even though I disagree with its conclusion. At least it is founded on a scholarly, judicial approach to a close issue on which there is room for disagreement. Bad judges might make bad law, but at least on my part that is not the situation here. Beyond what I have said I do not feel that any further discussion of personal assertions and attacks is appropriate. Indeed, I struggled a long time to consider whether I am lowering myself to the same level as Justice Eismann by even dignifying the attacks with a response. Enough said. Let's turn to the merits of the case.

I have joined the majority Opinion for one very simple reason. The fact is this case is nothing more than a matter of common sense and basic legal reasoning. I am a strong believer that sometimes the law gets lost in theories, over-analysis, and hyperbole and never sees the forest through the trees. Distilled to its essence, in my opinion this case boils down to a dispute between two respected, licensed and competent physicians over how and where Mrs. Nield contracted the infectious diseases with which she is afflicted. In my opinion, both physicians are qualified to state their opinions. This is not a matter of "junk science", such as is the subject of the United States Supreme Court decision in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993), which by the way the State of Idaho has never adopted. In this case, both physicians have medical training and expert knowledge regarding MRSA and pseudomonas and where they exist, how they are communicated, their treatment and their effect upon patients. It is agreed these experts do not have exactly the same qualifications or areas of specific expertise, but neither is required for an expert to state his or her opinion. *E.g., Weeks v. E. Idaho Health Serv.*, 143 Idaho 834, 837, 253 P.3d 1180, 1183 (2007) ("A qualified expert is one who possesses 'knowledge, skill, experience, training, or education.' I.R.E. 702. Formal training is not necessary, but practical experience or special knowledge must be shown . . . ."); *Warren v. Sharp*, 139 Idaho 599, 605, 83 P.3d 773, 779 (2003); *West v. Sonke*, 132 Idaho 133, 138, 968 P.2d 228, 233 (1998). Certainly, both have substantially more knowledge regarding the medical issues than the average juror and their testimony will undoubtedly be helpful to a jury. I.R.E. 702 ("If scientific, technical, or otherwise specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert . . . may testify . . . in the form of an opinion or otherwise"); *Bromley v. Garey*, 132 Idaho 807, 811, 979 P.2d 1165, 1169 (1998). It is not appropriate for any court, including this one, to weigh those credentials, weigh the credibility of each of the witnesses, or determine which witness is more persuasive. Those are matters exclusively within the province of a jury. That is the essence of my basis for agreeing with the majority opinion. Both the district court and Justice Eismann's dissent seem to disregard the status of this case and the junction at which we are. Nothing has been decided in this case about who should "win" this case, contrary to the assertions in Justice Eismann's dissent. All the majority has decided is that this case merits a jury trial on a genuine issue of material fact that is disputed between the parties and two experts. At least that is the sum total of my intent and expectations in joining the majority. I will not say, and it would be totally inappropriate for me to

23

do so, how I think this case should or will turn out. I can absolutely without any equivocation state that I am not in any way motivated by who should "win" this case. Such an assertion is totally unfounded and offensive to me.

J. JONES, Justice, specially concurring.

I fully concur in the Court's opinion. The Chief Justice has written a well informed and legally sound opinion and I wholeheartedly agree with it. The question is not whether Ms. Nield will ultimately win or lose but merely whether she is entitled to have a trial on the merits. This is a close question, as the Court fully recognizes, but on a close question the decision should be to allow a litigant to have his or her day in court.

Justice EISMANN, dissenting.

Courts decide cases in one of two ways: (a) they apply the law to the facts and thereby arrive at the result or (b) they determine the desired result and then twist the law and/or the facts to justify it. The error made by the district judge was applying the law to the facts, which produced a result that the majority does not like.

**I.**
**To Reach Its Result, the Majority Misstates What the District Court Ruled.**

The majority begins its analysis by stating that "[t]he district court determined that Dr. Selznick's affidavit was inadmissible because it did not negate possible alternate sources through which Dr. Coffman suggested Ms. Nield may have contracted MRSA." That statement is simply not true. To show the falsity of the statement, it is necessary to put in context what occurred.

On October 8, 2010, PCRC filed its motion for summary judgment. The basis of the motion was that Ms. Nield could not prove that PCRC's negligence was the cause of her infections. The motion was based upon the affidavit of Doctor Thomas J. Coffman which was also filed on October 8, 2010. Dr. Coffman was certified by the American Board of Internal Medicine in 1987 and by the American Board of Infectious Disease in 1990 and 2001; he was Chief of Staff at St. Luke's Regional Medical Center; he was chair of the St. Luke's Infection Control Committee and co-chair of Infections Control at St. Alphonsus Regional Medical Center,

24

positions he had held for about twenty years; and he had practiced infectious disease medicine since 1990. His affidavit dealt with the possible causes of Ms. Nield's infections.

With respect to MRSA, a summary of what Dr. Coffman stated is as follows:

a) A person may be colonized with MRSA without showing any signs or symptoms of infection, and most people who are colonized do not develop MRSA infections. The most common area of MRSA colonization is the nostrils, with other areas of colonization being the person's respiratory tract, urinary tract, open wounds, and catheters.

b) MRSA is ubiquitous within skilled nursing and long-term care facilities, and there are studies indicating that up to 25% of patients in those facilities are MRSA colonized.

c) MRSA can be transmitted in many ways, including contact with someone who has a MRSA infection, contact with someone who is colonized but not infected, contact with an object that is contaminated with MRSA, or breathing in droplets that were expelled during breathing, coughing, or sneezing by a person who is carrying or infected with MRSA.

d) It is not possible to stop the spread of MRSA in health care facilities and a resident of such a facility can become colonized or infected despite strict adherence to the appropriate infection control policy.

e) A person may be screened for MRSA to determine if the individual is colonized. Screening looks for the presence of the organism generally, and the most widely available form of screening in 2007 was nares culturing which looked for MRSA in the person's nostrils. That type of screening could identify 60-70% of the MRSA-colonized individuals, and another 10-15% could be identified through perineal or rectal culturing.

f) The records do not show that Ms. Nield was screened for MRSA before she was admitted to PCRC. Screening incoming patients at such a care facility was not the standard of care in 2007, and she was not screened when she was admitted to the PCRC. Without her being screened, it is not possible to determine whether she was MRSA colonized when she was admitted to the PCRC on August 25, 2007.

25

With respect to pseudomonas, a summary of what Dr. Coffman stated is as follows:

a) People may be carriers of pseudomonas without showing any signs or symptoms of infection, and most people who are colonized do not become infected. Studies show that 10% of the population may be colonized in their colons.

b) Pseudomonas is commonly found in medical care settings as well as in plants, soil, water, and animals.

c) Pseudomonas invades nearly all human tissue if weakened, such as open skin.

d) Pseudomonas can be transmitted through contact with a person who is a carrier or is infected, inhalation of pseudomonas aerosols, contact with water that has been exposed to the bacteria, eating contaminated raw vegetables, and contact with contaminated surfaces.

e) A person with colonized pseudomonas in his or her colon can transmit the bacteria to an open wound and become infected in numerous ways, including taking a shower with open wounds.

f) A resident at a skilled nursing facility such as PCRC can become colonized or infected with pseudomonas despite strict adherence to an appropriate infection control policy, and it is not possible to entirely stop the spread of that bacteria in health care facilities.

With respect to the source of Ms. Nield's MRSA and pseudomonas infections, a summary of what Dr. Coffman stated is as follows:

a) The wound culture done on August 21, 2007, when she was admitted to the Portneuf Medical Center (Hospital) does not rule out the possibility that she was either colonized or infected with either MRSA or pseudomonas for two reasons:

1) The records do not show that swabs were taken from each of her four wounds. It is possible that she had either or both bacteria in some but not all of her wounds.

2) It is possible that either or both bacteria were present in the wound swabbed, but were not the dominant bacteria and so were not grown out. Considering her circumstances before she was brought to the Hospital (chronic open wounds, unsanitary conditions, high susceptibility to infection, and lack of antibiotic treatment), she would be expected to have a whole host of bacteria

26

in her wet leg wounds, and a wound culture would include possibly dozens and dozens of different microorganisms. With such a wound culture, only the two or three dominant microorganisms would be grown out for identification.

b) Between Ms. Nield's admission to the PCRC on August 25, 2007, and the wound sample collected on November 9, 2007, that was positive for moderate MRSA and moderate pseudomonas, she was potentially exposed to those bacteria when she had contact with visitors, when she left the facility, and when she had contact with outside medical personnel. An unknown but potentially significant number of medical workers are MRSA colonized.

c) The wound cultures done on November 27, 2007, on January 18, 2008, and on March 13, 2008, did not reveal pseudomonas, indicating that her pseudomonas infection was resolved by her intravenous antibiotic therapy. Those cultures were much less likely to be false negatives because she was on antibiotic treatment, which would have eliminated a vast majority of the microorganisms.

d) It appears that the pseudomonas detected in the aspiration of her right hip that was done on May 2, 2008, was a different strain than the pseudomonas detected in the wound sample that had been collected on November 9, 2007. The report of the pseudomonas grown from her right hip was described as an extremely rare species that was susceptible only to Imipenem, Meropenem, Ceftazidime and Aztreonam antibiotics. However, the species identified in November 2007 was susceptible to Ciprofloxacin, Gentamicin and Levofloxacin antibiotics.[6]

e) Based upon the medical records, it is not possible to determine when, where, or how Ms. Nield became infected with MRSA or pseudomonas, and the pseudomonas found in her right hip in May 2008 was most likely acquired after she left PCRC.

Prior to PCRC's motion for summary judgment filed on October 8, 2010, Ms. Nield had received written reports from three experts: Suzanne Frederick, a registered nurse from Texas;

---

[6] While at PCRC, Ms. Nield was treated for the pseudomonas infection detected on November 9, 2007. A wound culture done on November 27, 2007, did not reveal any pseudomonas. On December 3, 2007, she left PCRC because her Medicare coverage was expiring and she did not want to risk losing assets in order to qualify for Medicaid. She returned home and was monitored by Creekside Home Health. During a home visit on February 25, 2008, it was discovered that Ms. Nield was "wrapping stones & other stuff into wound to aid in healing." An aspiration of her right hip done in Utah on May 2, 2008, revealed a chronic pseudomonas infection, which Dr. Coffman stated was a different strain of pseudomonas than the strain she had while at PCRC.

Sydney K. Gerber, a nursing facility administrator from Texas; and Hugh Selznick, an orthopaedic surgeon from Idaho. The nurse had submitted an 18-page report dated April 19, 2010, and a one-page addendum dated June 10, 2010. The administrator had submitted an undated nine-page report, but it was obviously submitted prior to the motion for summary judgment because the nurse cited it in her report dated April 19, 2010, as a document she reviewed. Dr. Selznick had submitted a 32-page report dated September 17, 2009, and an 11-page supplemental report dated November 25, 2009. All of the reports had been submitted prior to PCRC's motion for summary judgment.

After the motion for summary judgment was filed, Ms. Nield's counsel took the deposition of Dr. Coffman on November 19, 2010. Prior to the deposition, Ms. Nield's counsel obviously knew that Dr. Coffman had been given Dr. Selznick's report because her counsel questioned him about those areas with which he disagreed with Dr. Selznick. Three of those areas were as follows:

1) Dr. Coffman disagreed that the need to amputate Ms. Nield's lower leg was caused by a MRSA infection. She had leukocytoclastic vasculitis diagnosed in her foot, which Dr. Coffman stated was "an autoimmune kind of inflammatory condition" and "nobody knows what triggers it truly." He described the condition as follows:

> Leukocytoclastic vasculitis is a condition where inflammatory cells are recruited to blood vessels, typically dermal blood vessels, and they cause this intense inflammatory reaction in the vessel wall.
> And the vessel becomes more and more narrowed and finally plugs up. And you develop ulceration of this—of the overlying tissue. It just basically loses its blood supply and necrosis. It turns into a big, nasty, blistering open wound. And the depth and the width of it, you know, depends on the cause and the patient and, you know, different factors like that.

In Dr. Coffman's opinion, the fundamental reason she lost her leg was the leukocytoclastic vasculitis that would not go away. As he stated: "I don't think the MRSA really played much of a role. To phrase it another way, if she didn't have leukocytoclastic vasculitis, she wouldn't have lost her leg." The reason for his opinion was: "[T]hey treated her with a super powerful drug for MRSA, it didn't do anything for her foot. And if it was all MRSA, it should have cured it."

28

2) Dr. Coffman disagreed with Dr. Selznick's conclusion that Ms. Nield's pseudomonas that was treated at PCRC was the same infection that was later diagnosed in Ms. Nield's hip. Dr. Coffman explained: "She'd had a pseudomonas cultured apparently from one of her superficial wounds when she was in Pocatello, and then they cultured it from her hip in the spring of 2008, but it was a different pseudomonas in terms of its antibacterial susceptibility panel. So it wasn't the same bug that was in her leg in Pocatello." There was no indication that Dr. Selznick recognized that Ms. Nield's pseudomonas treated at PCRC was susceptible to antibiotics that were different from those to which her later pseudomonas was susceptible.

3) Dr. Coffman disagreed that PCRC had violated the standard of care in treating Ms. Nield. In his opinion, it did not.

After deposing Dr. Coffman, Ms. Nield filed affidavits from her three experts on November 30, 2010. Although Ms. Nield's counsel had questioned Dr. Coffman about his disagreements with statements made by Dr. Selznick in his reports, none of Ms. Nield's experts responded to any of the testimony in either Dr. Coffman's affidavit or his deposition. None of them disputed his testimony regarding potential causes of infection other than PCRC's negligence.

In the reports that they had submitted prior to the motion for summary judgment, Ms. Nield's experts all concluded that Ms. Nield contracted MRSA and pseudomonas as a result of PCRC's negligence based upon the temporal relationship between Ms. Nield's admission to PCRC and the onset of her infection—she did not become infected until after she was in that facility. None of them considered any cause of the infections other than the alleged negligence of PCRC. In their affidavits submitted in response to PCRC's motion for summary judgment, the experts simply restated the conclusions they had made in their reports without addressing anything stated by Dr. Coffman.

In summary, none of Ms. Nield's experts disagreed with Dr. Coffman's statements that are summarized as follows:

a) It is not possible to stop the spread of either MRSA or pseudomonas in a health care facility despite strict adherence to an appropriate infection control policy.

29

b) A person could be colonized with MRSA or pseudomonas without showing any signs or symptoms of infection, and it is not possible to determine whether Ms. Nield was colonized with either MRSA or pseudomonas when she was admitted to the PCRC.

c) The wound culture done on August 21, 2007, when Ms. Nield was admitted to the Hospital does not rule out that she was either colonized or infected with either MRSA or pseudomonas.

d) Ms. Nield could have been exposed to the MRSA and pseudomonas bacteria that caused the infections identified in the wound sample collected on November 9, 2007, from contact with her visitors, when she left the facility, or from contact with outside medical personnel. (The record on appeal shows that while she was at PCRC, at least fourteen friends and family members visited her; that she went to the Hospital on August 27, 2007, to have a PICC line installed; that she went to the dentist on October 12, 2007; and that she went to the Hospital gift shop in November 2007 before the wound culture. In addition, she was seen and treated by at least three physicians and a nurse practitioner who were not employees of PCRC.)

e) Ms. Nield's wound cultures done on November 27, 2007, on January 18, 2008, and on March 13, 2008, indicated that her pseudomonas infection resolved by her intravenous antibiotic therapy. The pseudomonas detected on May 2, 2008, at the hospital in Utah was a different strain than that for which she was treated at PCRC. (None of Ms. Nield's experts said anything about whether or not they were different strains.)

None of Ms. Nield's experts addressed any of these statements. None of them disputed Dr. Coffman's statements regarding the potential sources of infection other than PCRC's negligence. None of them stated that they had considered the other possible sources of infection mentioned by Dr. Coffman, but they still concluded that the alleged negligence of PCRC was the most likely cause. The only logical conclusion is either that Ms. Nield's counsel did not provide Dr. Coffman's affidavit or deposition testimony to Ms. Nield's experts, which would be highly unlikely, or that her counsel did provide them with those documents and Ms. Nield's experts could not dispute what Dr. Coffman said.

In deciding the issue, the district court relied upon our opinion in *Weeks v. Eastern Idaho Health Services*, 143 Idaho 834, 153 P.3d 1180 (2007), wherein we held that in situations where

there is more than one potential cause of an injury, the trial court can exclude an expert's opinion as to causation if the expert did not consider the other potential causes and explain why, in the expert's opinion, one particular cause was the most likely cause.

The district court did not conclude, as claimed by the majority, that Dr. Selznick's affidavit was inadmissible because "it did not negate possible alternate sources through which Dr. Coffman suggested Ms. Nield may have contracted MRSA." The district court did not base its opinion on the failure of Ms. Nield's experts to state that the other possible sources could not have caused her infections. Rather, the district court concluded that the affidavit was inadmissible under *Weeks* because Dr. Selznick failed to even *consider* those other possible sources of infection. The court wrote:

> In evaluating Selznick's affidavit and viewing it in the most favorable light to the Plaintiff, the Court must conclude that the validity of Dr. Selznick's reasoning and methodology regarding how the Plaintiff contracted MRSA and pseudomonas is without merit. Selznick makes a conclusion that because the Plaintiff was negative for MRSA and pseudomonas at the time of her admission to PCRC, but then tested positive for MRSA and pseudomonas prior to her discharge, then she must have contracted MRSA and pseudomonas while at PCRC. He does not address the other factors that could have been a substantial factor in causing the infections. . . . *Dr. Selznick failed to identify all of the potential causes of symptoms, eliminating hypotheses in order to reach a conclusion as to the most likely cause.*

(Emphasis added.)

Thus, the district court did not require Ms. Nield to negate the other potential sources of infection. It required, consistent with *Weeks*, that her expert Dr. Selznick consider the other potential causes and then state why he believed the negligence of PCRC was the most likely proximate cause, to a reasonable degree of medical probability. The district court did not require that Dr. Selznick be able to state that the other possible causes could not have been the cause in this case. As stated in the above quotation from its decision, the court ruled that "Dr. Selznick failed to identify all of the potential causes of symptoms, eliminating hypotheses in order to reach a conclusion as to the *most likely cause.*" (Emphasis added.)

In denying Ms. Nield's motion for reconsideration, the court found that the affidavits of her other experts were also inadmissible for the same reason. The court wrote:

> [T]he opinions of Dr. Selznick were not based on valid methodology or principles and failed to address basic undisputed medical principles with respect to MRSA and pseudomonas. . . .

Likewise, this Court properly exercised its gate-keeping role in regard to the affidavits of Suzanne Frederick and Sidney K. Gerber submitted by the Plaintiff in further support of her burden of proof. This Court conducted the same analysis as explained previously and found these affidavits to be similarly insufficient in establishing where and how the Plaintiff contracted MRSA and pseudomonas. . . . This Court correctly evaluated the affidavits submitted by the Plaintiff's experts and determined the causation analyses offered were not based on valid and reliable principles or methodology, and, therefore, unhelpful to the trier of fact.

"The trial court has discretion to decide the admissibility of expert testimony, and on appeal this decision will not be overturned absent an abuse of that discretion." *Clair v. Clair*, 153 Idaho 278, 290, 281 P.3d 115, 127 (2012). "When determining the admissibility of an expert's opinion, the focus of the trial court's inquiry is on the principles and methodology used and not the conclusions they generate." *J-U-B Engineers, Inc. v. Security Ins. Co. of Hartford*, 146 Idaho 311, 315, 193 P.3d 858, 862 (2008). There is no showing that the district court improperly applied our decision in *Weeks* or that it abused its discretion in holding inadmissible the affidavits of Ms. Nield's experts.

## II.
### In Order to Reverse the District Court, the Majority Misstates Our Holding in *Weeks*.

The majority contends that there are "misconceptions apparent in the district court's decision" in its application of *Weeks*. As will be shown, the district court correctly applied our decision in *Weeks*. The majority simply does not want to apply the *Weeks* opinion in this case, and so it redefines "differential diagnosis" in order to reverse the district court.

The majority first states: "While we have not previously defined 'diagnosis' in this context, we find the Black's Law Dictionary definition to be appropriate: 'The determination of a medical condition (such as a disease) by physical examination or by study of its symptoms.' " The majority's statement that we have not previously defined differential diagnosis is simply false. In *Weeks*, we adopted the concept of differential diagnosis utilized by the Ninth Circuit Court of Appeals in *Clausen v. M/V New Carissa*, 339 F.3d 1049 (9th Cir. 2003). By doing so, we adopted the definition of differential diagnosis used by the Ninth Circuit in that case.

The majority then says, "Some federal courts have employed a more expansive definition that incorporates 'differential etiology' which is . . . a process of identifying external causes by a process of elimination." As will be shown, *all* federal courts, not some, use the term differential

diagnosis to also mean differential etiology, and it was that definition of differential diagnosis that we adopted in *Weeks*.

Before addressing what we held in *Weeks*, it would be helpful to explain the difference between differential diagnosis as used in medicine and differential diagnosis as used by courts for determining the admissibility of expert testimony as to causation. The medical profession uses a process called differential diagnosis to reach a reasoned clinical decision as to the cause of a patient's symptoms. The medical definition of differential diagnosis is "the distinguishing of a disease or condition from others presenting with similar signs and symptoms."[7] With respect to the practice of medicine, differential diagnosis is used to diagnose a medical condition.

> [T]he differential diagnostic exercise involves six steps:
> • Making a list of possible diagnoses (internal disorders) that could explain the presenting symptoms or observations;
> • Taking a thorough medical history;
> • Conducting a careful and complete physical examination;
> • Ordering and interpreting the indicated tests;
> • Ruling out diagnoses that do not fit the history or findings noted above;
> • Arriving at the diagnosis that best fits the first five elements.

Ronald E. Gots, M.D., Ph.D., *For the Defense*, 26 (July 2005).

Federal Rule of Evidence 702 governs the admissibility of scientific evidence in federal district court. "In *Daubert*, the Supreme Court charged district courts with the responsibility of ensuring that proferred [sic] scientific evidence is both relevant and reliable." *Clausen*, 339 F.3d at 1055-56. As a means of ensuring the reliability of expert testimony, all of the federal courts of appeal have adopted the methodology of differential diagnosis as a means for determining the reliability of expert testimony as to specific causation.[8] When doing so, many of them used the

---

[7] http://www.merriam-webster.com/dictionary/differential%20diagnosis (last visited January 31, 2014).

[8] *Raynor v. Merrell Pharm. Inc.*, 104 F.3d 1371, 1376 (D.C. Cir. 1997); *Granfield v. CSX Transp., Inc.*, 597 F.3d 474, 486 (1st Cir. 2010); *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1044 (2d Cir. 1995); *Kannankeril v. Terminix Intern., Inc.*, 128 F.3d 802, 807 (3d Cir. 1997); *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 262 (4th Cir. 1999); *Johnson v. Arkema, Inc.*, 685 F.3d 452, 468-69 (5th Cir. 2012); *Best v. Lowe's Home Ctrs., Inc.*, 563 F.3d 171, 179 (6th Cir. 2009); *Myers v. Illinois Cent. R.R. Co.*, 629 F.3d 639, 644 (7th Cir. 2010); *Bland v. Verizon Wireless, (VAW) L.L.C.*, 538 F.3d 893, 897 (8th Cir. 2008); *Clausen v. M/V New Carissa*, 339 F.3d 1049, 1057 (9th Cir. 2003); *Bitler v. A.O. Smith Corp.*, 400 F.3d 1227, 1236-37 (10th Cir. 2004); *Guinn v. AstraZeneca Pharmaceuticals LP*, 602 F.3d 1245, 1253-54 (11th Cir. 2010).

An expert may rely upon differential diagnosis to form an opinion as to specific causation, but not as to general causation. *Johnson*, 685 F.3d at 468. "General causation is whether a substance is capable of causing a particular injury or condition in the general population, while specific causation is whether a substance caused a particular individual's injury." *Id.* (quoting *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 351 (5th Cir. 2007)).

term "differential diagnosis" analogically to its proper use in a medical context. *Bitler v. A.O. Smith Corp.*, 400 F.3d 1227, 1236 (10th Cir. 2004). When referring to an expert opinion as to causation, it would be more accurate to call the methodology "differential etiology" or "differential causation." "Etiology is the study of causation." *Myers v. Illinois Cent. R.R. Co.*, 629 F.3d 639, 644 (7th Cir. 2010). As explained by the Eleventh Circuit:

> Differential diagnosis involves "the determination of which one of two or more diseases or conditions a patient is suffering from, by systematically comparing and contrasting their clinical findings." This leads to the diagnosis of the patient's condition, not necessarily the cause of that condition. The more precise but rarely used term is differential etiology, which is "a term used on occasion by expert witnesses or courts to describe the investigation and reasoning that leads to the determination of external causation, sometimes more specifically described by the witness or court as a process of identifying external causes by a process of elimination."

*McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1252 (11th Cir. 2005) (citation omitted). However, even federal courts that expressly acknowledge the difference between differential diagnosis and differential etiology choose to follow the trend of other courts and use the term differential diagnosis to refer to both concepts. *Guinn v. AstraZeneca Pharm. LP*, 602 F.3d 1245, 1253 n.6 (11th Cir. 2010) ("Following the trend among federal courts, however, we will use the term differential diagnosis to refer to both concepts.").

Thus, federal courts use differential diagnosis to refer to both the method utilized to clinically diagnose a patient's symptoms and the method to determine the external cause of the medical condition. That method of reasoning is not limited to reaching an opinion as to the external cause of a medical condition. *Bitler*, 400 F.3d at 1236 (expert opinion as to cause of gas explosion by use of differential analysis to exclude other potential causes was admissible). In both cases, the expert uses a similar inductive reasoning process—abductive reasoning. "'[A]bductive inferences' are drawn about a particular proposition or event by a process of eliminating all other possible conclusions to arrive at the most likely one, the one that best explains the available data." *Id.* at 1237 n.5. The basic difference is that differential diagnosis is a reasoning process to determine the patient's condition in order to determine treatment while differential etiology is a similar reasoning process to determine how the patient's condition came about in order to determine liability. Federal courts call both of them differential diagnosis.

The question, then, is what did we mean in *Weeks* when we adopted the concept of differential diagnosis announced in *Clausen* to determine the admissibility of an expert's opinion? Was it differential diagnosis in the sense of determining what medical condition was causing the patient's symptoms or was it differential diagnosis in the sense of determining what caused the patient's condition? It is obvious that we were referring to what would more correctly be termed differential etiology or differential causation—whether the nurse's negligence was the proximate cause of the patient's death.

In *Weeks*, we adopted differential diagnosis as used by the Ninth Circuit Court of Appeals in *Clausen* when determining the admissibility of an expert's opinion as to the cause of death, not as to diagnosing symptoms. We stated:

> The Ninth Circuit allowed for the use of differential diagnosis under *Daubert* [*v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993)] to establish reliability of an expert's opinion. *Clausen*, 339 F.3d at 1057–58. Differential diagnosis involves an analysis of all hypotheses that might explain the patient's symptoms or mortality. *Id.* After identifying all of the potential causes of symptoms, the expert then engages in a process of eliminating hypotheses in order to reach a conclusion as to the most likely cause. *Id.* When using differential diagnosis a district court is justified in excluding the expert's testimony if the expert fails to offer an explanation why an alternative cause is ruled out. *Id.* The logic of the Ninth Circuit is sound.

*Weeks*, 143 Idaho at 839, 153 P.3d at 1185.

The issue in *Weeks* was not diagnosing a patient's symptoms. The issue was whether the nurse's negligence was a proximate cause of a patient's death.

"Evelyn Weeks entered the hospital on May 12, 2003, after collapsing at her home. . . . A CT scan revealed a hemorrhage and hematoma in her brain. Early the following morning a catheter was placed in her head to drain excess fluid from her brain." 143 Idaho at 836, 153 P.3d at 1182. After a lengthy surgery, she was placed in intensive care. *Id.* While she was in intensive care, it was discovered that a mixture of dopamine, amiodarone, magnesium sulphate, potassium phosphate, and potassium chloride were infusing into the catheter rather than into an intravenous line. *Id.* Her condition deteriorated and her family gave their consent to take her off life support. She died on May 21, 2003. Her heirs filed a wrongful death action on June 30, 2003. The issue in the case was not a dispute over what was causing her symptoms (no heartbeat). She was admittedly dead. The issue was whether her death was proximately caused by the negligence of a nurse. As this Court stated: "EIRMC admitted that the nursing error

35

violated the standard of care. The issues for trial were *causation* and damages." *Id.* (emphasis added).

The district court held inadmissible the opinion of the plaintiff's expert as to the proximate cause of the patient's death, not an opinion as to the diagnosis of the patient's symptoms. As we stated, "The district court granted EIRMC's motion for summary judgment, concluding that the case required expert testimony to *prove causation*, and that the Weeks' expert, Dr. Edward Smith, [a board-certified neurosurgeon,] was not competent to testify regarding *the effect of the nursing error.*" *Id.* (emphases added). The district court held that Dr. Smith was not qualified because there was no research showing that the error by the nurse could cause the injury suffered by the patient. The district court reasoned as follows:

> Dr. Smith admitted that no research has been done concerning the exact physiological effects of this type of infusion on the brain. The fact that no such research has been performed means that it has not been subjected to peer review and publication. There is no way to know the error rate of conclusions based on unperformed research. No standards exist to govern the use of information that has never been studied. And, conclusions based on unperformed research do not usually attract widespread acceptance within the scientific community.

As shown in the quotation above from *Weeks* regarding the methodology of differential diagnosis, in holding that the physician's testimony was admissible, we adopted the Ninth Circuit Court's definition of differential diagnosis as set forth in *Clausen*. The issue in *Clausen* was not the diagnosis of symptoms. It was whether an expert was qualified to testify that an oil spill resulting from a ship wreck on the Oregon coast was a proximate cause of the destruction of oyster beds. As the court stated, "In this case, involving the destruction of oyster beds which allegedly occurred as a result of an oil spill on the Oregon coast, we must determine the admissibility of expert testimony on the issue of causation." *Clausen*, 339 F.3d at 1051. Each side had an expert on causation. Both experts agreed "that the deaths were caused by bacterial infection", which "was a direct result of gill lesions the oysters had developed." *Id.* at 1053. The issue was what caused the gill lesions that resulted in the bacterial infection. The two experts both identified the same six possible causes and ruled out four of them, but they disagreed as to which of the two remaining suspects was the actual cause. *Id.* The plaintiffs' expert contended that oil particulates caused lesions in the oysters' gills, leading to the bacterial infection that ultimately caused their deaths. *Id.* The defendants' expert contended the gill lesions were caused by low salinity in the estuary where the oyster farms were located, which was caused by

36

heavy rainfall that increased the streamflow into the estuary. *Id.* The defendants' pretrial motion to exclude the plaintiffs' expert's testimony as being unreliable was denied by the trial court. *Id.* at 1055. The jury believed that expert and awarded the plaintiffs $1.4 million, and the defendants appealed. *Id.*

The Ninth Circuit began its analysis of the reliability and admissibility of the plaintiffs' expert's testimony by discussing differential diagnosis. *Id.* at 1057. The court noted that "[d]ifferential diagnosis is a common scientific technique, and federal courts, generally speaking, have recognized that a properly conducted differential diagnosis is admissible under *Daubert*." *Id.* It stated, "A whole sub-body of *Daubert* law has developed with respect to the reliability, and admissibility, of differential diagnosis." *Id.*

After quoting a medical definition of differential diagnosis, the *Clausen* court footnoted the quotation with the statement, "Courts that have discussed differential diagnosis have come to use the term in ways that differ slightly from its dictionary definition, and from its usage in the medical community." *Id.* n.4. The court then explained, "Whereas most physicians use the term to describe the process of determining which of several diseases is causing a patient's *symptoms*, courts have used the term in a more general sense to describe the process by which *causes* of the patient's *condition* are identified." *Id.* (citation omitted).

Thus, the *Clausen* court did not use the Black's Law Dictionary or the medical definition to define differential diagnosis, nor did we when we adopted the concept. Since we adopted the methodology of differential diagnosis as set forth in *Clausen*, we obviously also adopted that court's definition of the term. The use of that methodology to diagnose symptoms was not an issue in either *Weeks* or *Clausen*. In both cases, the methodology of differential diagnosis was used to determine the qualifications of an expert to testify as to the proximate cause of injury.

In applying differential diagnosis to determine the admissibility of expert testimony, the first step is compiling a list of the possible causes. *Id.* at 1057. "A differential diagnosis that fails to take serious account of other potential causes may be so lacking that it cannot provide a reliable basis for an opinion on causation." *Id.* at 1058 (quoting *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 265 (4th Cir. 1999)). The issue in *Westberry* was the proximate cause of an injury, not the diagnosis of a medical condition.[9]

---

[9] In *Westberry*, the plaintiff contended that the defendant's "failure to warn him of the dangers of breathing airborne talc proximately caused the aggravation of his pre-existing sinus condition." *Westberry v. Gislaved Gummi AB*, 178

The next step is "eliminating hypotheses on the basis of a continuing examination of the evidence so as to reach a conclusion as to the most likely cause of the findings in that particular case. A district court is justified in excluding evidence if an expert 'utterly fails . . . to offer an explanation for why the proffered alternative cause' was ruled out." *Clausen*, 339 F.3d at 1058 (quoting *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 202 (4th Cir. 2001)). The issue in *Cooper* was proximate cause of an injury, not diagnosis of a medical condition.[10]

Thus, the rule regarding differential diagnosis adopted in *Weeks* was not simply to diagnose what medical condition was causing the patient's symptoms. It was, as in *Clausen*, to determine the reliability and admissibility of an expert's opinion on the issue of proximate cause in a negligence action. In fact, in *Clausen* it was used to determine the reliability and admissibility of an expert's opinion as to the proximate cause of an infection, which is precisely the issue to which the district court utilized differential diagnosis in this case.

In summary, the majority incorrectly states that the district court's opinion exhibited "misconceptions" about differential diagnosis and that in *Weeks* we did not state what we meant by that term. By adopting the Ninth Circuit's logic in *Clausen*, we adopted differential diagnosis as set forth in the opinion, which dealt with causation to determine liability, not the diagnosis of symptoms to determine treatment. The district court accurately analyzed our opinion in *Weeks* and properly applied it in this case. The majority is simply being untruthful when it states that

---

F.3d 257, 260 (4th Cir. 1999). The only issue on appeal was whether "the district court abused its discretion in admitting the opinion testimony of Dr. Isenhower concerning the cause of Westberry's sinus problems." *Id.* The defendant contended that differential diagnosis was not sufficient to establish the reliability of the doctor's opinion. *Id.* at 262. In beginning its discussion of the issue, the court stated, "Differential diagnosis, or differential etiology, is a standard scientific technique of identifying the cause of a medical problem by eliminating the likely causes until the most probable one is isolated." *Id.* The court concluded that "a reliable differential diagnosis provides a valid foundation for an expert opinion." *Id.* at 263. The court was referring to what is more accurately called differential etiology.

[10] In *Cooper*, the plaintiff contended that the "use of pedicle screw fixation devices to treat spinal injuries . . . was responsible for his failed back surgeries and the accompanying deleterious side effects." *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 196 (4th Cir. 2001). The plaintiff "retained Dr. Mitchell to serve as his medical expert on specific causation." *Id.* at 198. The district court granted the defendant's motion to exclude all of the doctor's testimony. *Id.* at 199. On appeal the plaintiff contended that "Dr. Mitchell conducted a differential diagnosis to determine the cause of his injuries," *id.* at 200, but the appellate court disagreed, stating that "if an expert utterly fails to consider alternative causes or fails to offer an explanation for why the proffered alternative cause was not the sole cause, a district court is justified in excluding the expert's testimony," *id.* at 202. There was evidence in the record that smoking could also have been a cause of the failed fusion of the plaintiff's vertebra, and "Dr. Mitchell did not identify specifically how he ruled out smoking and other potential causes of the nonunion." *Id.* at 202-03.

38

"[t]his Court has not had occasion to flesh out the parameters of the differential diagnosis methodology."

In adopting the Ninth Circuit definition, we concluded, "The logic of the Ninth Circuit is sound." *Weeks*, 143 Idaho at 839, 153 P.3d at 1185. That logic is simply that in order to testify as to causation where there is more than one potential cause, the expert should consider all potential causes and then explain why, in forming his or her opinion, the expert ruled out the other causes as being the most likely cause. When the author of the majority opinion in this case was a trial judge, he used that reasoning as a basis for holding inadmissible the affidavit of an electrician offered as expert testimony regarding the cause of a house fire, stating, "Finally, Mr. Bidstrup [the electrician] does not explain how he ruled out other possible sources of ignition." *Carnell v. Barker Mgmt., Inc.*, 137 Idaho 322, 48 P.3d 651 (2002) (*Carnell* R. Vol. VIII, p. 1357). The author of the majority does not seek to explain why the methodology he used when a trial judge in the *Carnell* case and the methodology we held was logical in *Weeks* has now become illogical.

Why should an expert be permitted to express an opinion about causation when the expert does not even know of the other potential causes? Why should an expert be permitted to testify about causation when the expert did not even consider the other potential causes? The majority has not even attempted to provide logical answers to these questions.

The district court entered its decision granting PCRC's motion for summary judgment on January 21, 2011. Ms. Nield then filed a motion for reconsideration on February 4, 2011. When considering a motion for reconsideration, the trial court is to consider any new or additional facts that bear on the correctness of the order being reconsidered. *Coeur d'Alene Mining Co. v. First Nat. Bank of North Idaho*, 118 Idaho 812, 823, 800 P.2d 1026, 1037 (1990). "A rehearing or reconsideration in the trial court usually involves new or additional facts, and a more comprehensive presentation of both law and fact." *J. I. Case Co. v. McDonald*, 76 Idaho 223, 229, 280 P.2d 1070, 1073 (1955). In support of her motion for reconsideration, Ms. Nield could have sought to comply with *Weeks* and present additional affidavits from her experts setting forth that they had considered the other potential causes of Ms. Nield's infections and explaining that they still considered the negligence of PCRC the most likely cause or disputing Dr. Coffman's assertions that there were other potential causes. However, she did not do so. She did not present any additional affidavits. In her supporting brief, she did assert that she "was not

required to establish proximate cause by showing that she only contracted MRSA and PA from PCRC." Because it would have been a simple matter to present such additional affidavits, the only reasonable inference is that Ms. Nield's experts did not contest Dr. Coffman's assertion that there were potential causes of Ms. Nield's infections that were unrelated to the alleged negligence of PCRC and that they could not explain why they believed that PCRC's alleged negligence was a more likely cause than were the other potential causes.

The *Weeks* opinion also stands in the way of the majority's desired result. In order to circumvent that decision, the majority simply mischaracterizes it. By redefining the term differential diagnosis to mean something other than how it was used in *Weeks*, the majority is, in essence, overruling *Weeks sub silentio*. As the author of the majority opinion in this case wrote in *Union Pac. Land Res. Corp. v. Shoshone Cnty. Assessor*, 140 Idaho 528, 96 P.3d 629 (2004):

> The doctrine of stare decisis is grounded on public policy and, as such, is entitled to great weight and must be adhered to, unless the reasons therefore have ceased to exist, are clearly erroneous, or are manifestly wrong and mischievous or unless more harm than good will result from doing so. . . . So, where the court has decided a question of law in another case and a like state of facts is subsequently presented, the rule of stare decisis applies and will not be easily changed.

*Id.* at 533, 96 P.3d at 634 (quoting *State v. Card*, 121 Idaho 425, 825 P.2d 1081 (1991)). The majority does not contend that the reasons for our adoption of the Ninth Circuit's differential diagnosis analysis in *Clausen* for determining the admissibility of expert testimony as to specific causation have ceased to exist, are clearly erroneous, or are manifestly wrong. The only apparent reason for redefining differential diagnosis is to find a way to reverse the district court so that Ms. Nield can prevail in this action.

### III.
### In Order to Reverse the District Court, the Majority Mischaracterizes What the District Court Did and then Creates an Illogical Rule that the Admissibility of an Expert's Opinion Can Only Be Determined Based Upon What that Expert Says.

The majority states that "[t]he district court erred in using Dr. Coffman's affidavit as a yardstick for determining the admissibility of Ms. Nield's affidavits." According to the majority, "Even if Dr. Coffman was the gold standard, it was inappropriate for the district court to use his affidavit as a yardstick to measure Dr. Selznick's testimony and to conclude that, in order to be admissible, Dr. Selznick's affidavit had to counter every statement contained in Dr. Coffman's affidavit." That statement simply mischaracterizes what the district court did.

40

As stated above, Dr. Coffman stated in his affidavit that there were potential causes of Ms. Nield's infections other than the alleged negligence of PCRC, and he listed those potential causes. None of Ms. Nield's experts disputed those portions of Dr. Coffman's affidavit. **This is not an issue of weighing the conflicting opinions of experts.** With respect to the existence of other potential causes, there was no conflict among the experts. Dr. Coffman made factual statements as to other potential causes, and none of Ms. Nield's experts disputed those statements. For the purpose of summary judgment, those statements must be taken as true. The district court did not use Dr. Coffman's affidavit as a "yardstick" to judge the affidavits of Ms. Nield's experts. Instead, the court merely accepted as true the *uncontradicted* statements in Dr. Coffman's affidavit regarding the existence of other potential causes of Ms. Nield's infections.

"Decisions by this Court demonstrate that when faced with a motion for summary judgment, the party against whom it is sought may not merely rest on allegations contained in his pleadings, but must come forward and produce evidence by way of deposition or affidavit to contradict the assertions of the moving party and establish a genuine issue of material fact." *Olsen v. J.A. Freeman Co.*, 117 Idaho 706, 720, 791 P.2d 1285, 1299 (1990). In this case, in order to respond to the motion for summary judgment, *Weeks* required that Ms. Nield provide an expert who either: (a) stated that Dr. Coffman was wrong regarding the existence of the other potential causes of Ms. Nield's infections; or (b) provided an explanation as to why, in the expert's opinion, the other potential causes were not the most probable cause but PCRC's negligence was. Ms. Nield did not do either.

In order to reverse the district court, the majority adopts a rule that matters not contained in an expert's affidavit cannot be considered when determining the admissibility of that expert's opinion. In other words, when determining admissibility, the affidavit must be viewed in a vacuum. The majority's new rule is both illogical and contrary to this Court's existing authority.

Because affidavits supporting or opposing a motion for summary judgment "shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein," I.R.C.P. 56(e), the rules for the admissibility of an expert's opinion set forth in an affidavit are the same as for an expert's opinion offered during trial. We have held that in both summary judgment and trial, the admissibility of an expert's opinion is not judged in a vacuum, but matters not contained in the expert's opinion may be considered when deciding the admissibility of that opinion. "The facts upon which a

41

hypothetical question is based must be admitted by the adverse party or be supported in the evidence in the record at the time the question is propounded." *State v. Birrueta*, 101 Idaho 915, 916, 623 P.2d 1292, 1293 (1981) (citations omitted). Likewise, "[w]e have held that, to be admissible, an expert's testimony must assist the trier of fact to understand the evidence or to determine a fact in issue and that an expert's opinion that is . . . unsubstantiated by facts in the record is inadmissible because it would not assist the trier of fact." *J-U-B Engineers, Inc.*, 146 Idaho at 316, 193 P.3d at 863 (citation omitted). In both instances, the court would have to look to the facts in the record to determine whether the expert's opinion was admissible.

For example, in *Swallow v. Emergency Medicine of Idaho, P.A.*, 138 Idaho 589, 591, 67 P.3d 68, 70 (2003), a urologist erroneously wrote a prescription for Ciprofloxacin (Cipro) at three times the intended dosage, and his patient suffered a heart attack shortly after taking the erroneously prescribed dosage. The patient and his wife filed an action seeking damages for medical malpractice. The patient retained Dr. Tommaso, a cardiologist, and he testified in his deposition that in his opinion the overdose of Cipro caused the patient's heart attack. *Id.* The defendants moved to exclude Dr. Tommaso's opinion because there was no scientific evidence that Cipro could cause a heart attack (no evidence of general causation). *Id.* The district court granted the motion and later granted the defendants' motion for summary judgment because with the opinion excluded, there was no admissible evidence showing that Cipro could cause a heart attack. *Id.* Dr. Tommaso had testified: "We don't know the pathophysiology. I'm aware from the PDR [Physicians' Desk Reference] and from the FDA [Food and Drug Administration] that Cipro can precipitate a myocardial infarction." *Id.* at 593, 67 P.3d at 72. In upholding the ruling excluding Dr. Tommaso's opinion, we considered evidence to which he did not testify. We looked at the PDR and the adverse reaction reports from the FDA and held that he had misread them and that they did not support his opinion. We looked at the PDR and held, "The PDR does not state that Cipro can cause a myocardial infarction." *Id.* With respect to the adverse drug reports submitted to the FDA, we stated, "The applicable regulation defines 'adverse drug experience' as '[a]ny adverse event associated with the use of a drug in humans, whether or not considered drug related.' " *Id.* at 594, 67 P.3d at 73. Dr. Tommaso had agreed that the ten adverse drug experience reports "were based solely upon the temporal relationship between the administration of Cipro and the adverse cardiac event," and we held the reports were insufficient to support an opinion as to causation because "there is no showing that ten adverse cardiac

42

events occurring over eight years to patients who had been administered Cipro is a greater incidence of such events than would be expected to occur by chance." *Id.*

Under the majority's new rule, we would have had to reverse the district court in *Swallow* because we would not have been able to look beyond the face of the expert's opinion. He testified that "I'm aware from the PDR and from the FDA that Cipro can precipitate a myocardial infarction," and we would have had to accept that testimony at face value. We could not have questioned whether the PDR and the FDA adverse reaction reports really did show that Cipro can precipitate a heart attack. However, we upheld the exclusion of the opinion because we conducted our review of the PDR and FDA adverse reaction reports and concluded that they did not support the expert's opinion.

"When determining the admissibility of an expert's opinion, the focus of the trial court's inquiry is on the principles and methodology used and not the conclusions they generate." *Fragnella v. Petrovich*, 153 Idaho 266, 274, 281 P.3d 103, 111 (2012). In the instant case, the district court considered undisputed facts in the record (there were other potential causes of Ms. Nield's infections) and then examined the affidavits of Ms. Nield's experts to see if they utilized the methodology required by *Weeks* to be able to express an admissible opinion that the alleged negligence of PCRC was the most likely cause of her infections. Because the affidavits did not show that Ms. Nield's experts had followed the methodology required by *Weeks*, the court correctly held that their opinions as to causation were inadmissible.

The majority now holds, unsupported by any authority, that when determining the admissibility of an expert's opinion, the trial court cannot consider undisputed relevant facts in the record if they are not contained in the expert's affidavit. With respect to the application of the *Weeks* methodology, the majority would hold that an expert's opinion on causation is admissible even though the expert is unaware of other undisputed potential causes. Under the majority's "new rule," the expert need only engage in the reasoning required by *Weeks* if the expert admits in his or her affidavit that there are other potential causes that the expert did not consider. What is the logic behind that new rule? What policy is advanced by creating a rule that would make opinions of uniformed experts admissible? Under the majority's new rule, if an expert is aware of other potential causes but does not admit they exist in the expert's affidavit, then the expert would not have to explain why the expert's chosen cause was more likely than the other potential causes.

43

## IV.
## The Majority Erroneously Holds that Expert Testimony Was Not Necessary In This Case.

The majority holds that expert testimony was not necessary as to the cause of Ms. Nield's infections. According to the majority, "Once the experts have opined as to the potential sources of an infection, it does not particularly take expert testimony to establish exactly how a particular person contracted a particular infection."

In holding that expert testimony as to causation was required, the district court ruled as follows:

> Our present case requires the testimony of experts to establish proximate cause of the injury suffered by the Plaintiff. The Plaintiff must prove that the Defendant's actions or nonactions were a substantial factor in her contracting MRSA and pseudomonas. The process in which people contract infectious diseases is outside the scope of knowledge of a jury and requires the assistance of experts to explain how infections are contracted and spread.

In evaluating that holding, decisions of this Court as to lay testimony regarding causation are relevant. There is no difference from the jury, composed of lay people, deciding the cause of a medical condition without an expert's opinion as to that cause and a lay person testifying as to the cause. "We have previously held that a lay person was not qualified to give an opinion about the cause of a medical condition or disease." *Harrison v. Binnion*, 147 Idaho 645, 651, 214 P.3d 631, 637 (2009); *Accord Swallow*, 138 Idaho at 597, 67 P.3d at 76. When previously addressing whether lay opinion testimony as to medical causation is admissible, we have stated:

> Where the subject matter regarding the cause of disease, injury, or death of a person is wholly scientific or so far removed from the usual and ordinary experience of the average person that expert knowledge is essential to the formation of an intelligent opinion, only an expert can competently give opinion evidence as to the cause of death, disease or physical condition.

*Evans v. Twin Falls Cnty.*, 118 Idaho 210, 214, 796 P.2d 87, 91 (1990).

"In a case such as this, where an injury has multiple potential etiologies, expert testimony is necessary to establish causation, even in view of plaintiff's reduced burden to prove causation [in Jones Act cases]." *Wills v. Amerada Hess Corp.*, 379 F.3d 32, 46 (2d Cir. 2004). If all of the potential causes of Ms. Nield's infections are equally likely, how could the jury choose one over the others? It would merely be based upon speculation or emotion. If all of the potential causes are not equally likely, then it will take an expert to testify as to which is the most likely. Without

44

that testimony, how could Ms. Nield meet her burden of proving by a preponderance of the evidence that the negligence of PCRC was the proximate cause of her infections? There is no logical basis for the majority's holding.

"The function of the expert is to provide testimony on subjects that are beyond the common sense, experience and education of the average juror. Where the normal experience and qualifications of lay jurors permit them to draw proper conclusions from given facts and circumstances, then expert conclusions or opinions are inadmissible." *Warren v. Sharp*, 139 Idaho 599, 606, 83 P.3d 773, 780 (2003) (quoting *Rockefeller v. Grabow*, 136 Idaho 637, 647, 39 P.3d 577, 587 (2001) (citations omitted)). Thus, if expert testimony is not needed to determine the cause of Ms. Nield's infections, then her experts could not testify as to their opinions of the cause.

In this case, even the experts do not agree as to the nature of pseudomonas and MRSA. Dr. Coffman disagreed with Dr. Selznick's statement that pseudomonas was a very uncommon bacteria. Dr. Coffman stated, "I see pseudomonas every day in the hospital. . . . I mean it's a— people carry pseudomonas just like they can carry staph. So it really is not that rare." He later explained that pseudomonas "just likes to live in water. You know, you go out to the New York Canal and you'll find pseudomonas. It will grow nearly anyplace." He recounted an article about how pseudomonas was even growing in jet fuel and plugged the fuel filter in a jet airplane, causing it to crash. Dr. Coffman also disagreed with Dr. Selznick's statement that "MRSA is not a community-acquired staph but rather a bacteria often acquired nosocomially or as a result of hospitalization." He said that in the early to mid-1990's, "at the end of the year we'd have six or seven, maybe eight MRSA strains for the whole year in the hospital. Now we get that many a day." Dr. Coffman explained: "Actually, I can show you data from our laboratories here in Boise at least, our two local hospitals, that we have five times as much outpatient MRSA as we do inpatient MRSA. . . . Anyway, so he's clearly wrong. It is a community-acquired staph. In fact, it's more often now a community-acquired staph than it is hospital-acquired staph." He added that Ms. Nield's "strain is more closely associated with a community-associated strain than a hospital-associated strain," based upon "[t]he antibacterial susceptibility profile."

The majority seeks to support its conclusion that expert testimony as to causation is unnecessary in this case with our decision in *Sheridan v. St. Luke's Regional Medical Center*, 135 Idaho 775, 25 P.3d 88 (2001). That case is inapposite. In *Sheridan*, the issue of causation

45

was the damages resulting from the failure to treat a medical condition, not the cause of the medical condition. "Specifically, the Sheridans argue St. Luke's and Dr. Jambura negligently treated their son Cal's jaundice and elevated bilirubin levels, leading to permanent and irreparable brain damage." *Id.* at 778, 25 P.3d at 91. The jury returned a verdict in favor of St. Luke's and Dr. Jambura, and the district court granted the Sheridans' motion for a new trial on the ground of insufficiency of the evidence to justify the verdict. *Id.* at 779, 25 P.3d at 92. The trial judge's decision to grant a new trial on that ground is discretionary. *Id.* at 780, 25 P.3d at 93.

St. Luke's was the only appellant. It contended that there was insufficient evidence to show that the negligence of its nurses was a proximate cause of the child's resulting injury from the failure to treat his jaundice, and therefore it was error to grant a new trial and to deny its motion for a directed verdict.

A brief summary of what occurred while Cal was at the hospital is as follows:

> Cal Sheridan was born at 11:52 p.m. on March 23, 1995 at St. Luke's. Dr. Jambura examined Cal approximately 10 hours after birth. Within 17 hours of birth, a nurse's chart note indicated the presence of jaundice. The pediatrician, Dr. Jambura, was not notified. The next shift nurse also noted jaundice, approximately 24 hours after birth. Jambura again was not notified. On March 25, 33-34 hours after birth, Dr. Jambura examined Cal, performed a circumcision, and cleared Cal to leave the hospital. At the time of his discharge, the medical chart noted Cal "has moderate icterus [newborn jaundice] on head, mild icterus on body." The Sheridan's were provided a handout on jaundice. Cal's bilirubin levels were not measured and the parents were not offered any special counseling regarding abnormal jaundice.

*Id.* at 779, 25 P.3d at 92.

The jaundice was caused by the fact that the child and his mother had different blood types. *Id.* at 783, 25 P.3d at 96. "Although both [nurses] testified that they would be concerned if the jaundice progressed rapidly—that it was the progress of the jaundice rather than the mere presence of it that would be of concern to them—neither noted on chart any indicia from which the progress could be ascertained." *Id.* The nurses who noted toward the end of Cal's hospital stay that he was jaundiced did not inquire of the nurses who initially cared for him to determine if the jaundice was becoming more severe. *Id.* The nurse who cared for him on the morning of his discharge from the hospital "noted that the jaundice was present over his entire body— moderate on head and mild on trunk and extremities—but did not consider this as alarming." *Id.*

None of the nurses informed the pediatrician that Cal had any abnormal symptoms or conditions. *Id.* There was also "confusion in the chart [that] led the doctors to assume that the blood types were the same when they were not." *Id.*

In discussing the nurses' negligence in its decision granting the new trial, the district court wrote:

> While I think the pediatrician in this case must bear the brunt of responsibility for the mismanagement of Cal's care, in my mind at least some degree of fault is attributed to the failure of the newborn nurses to be the "physician's eyes and ears" at the outset of Cal's life. I am satisfied that if the nurses had sounded the alarm upon the first observation of jaundice, and had pressed for appropriate bilirubin monitoring before he was discharged from the hospital the first time, the catastrophe that befell a few days later *would* have been completely averted.

*Id.*

Cal was subsequently diagnosed to have "kernicterus, a form of cerebral palsy associated with a neonatal history of elevated serum bilirubin and consequent jaundice," *id.* at 779, 25 P.3d at 92, although that diagnosis was disputed at trial, *id.* at 782, 25 P.3d at 95. In granting a new trial, the district judge concluded that the clear weight of the evidence supported the diagnosis of kernicterus. *Id.*

There was no contention that the nurses caused the jaundice. The issue was whether their negligence in failing to notify the pediatrician of Cal's worsening condition while he was still at the hospital was a proximate cause of his kernicterus. The pediatrician who saw Cal 78 hours after his discharge from the hospital noted that Cal's jaundice had increased, but did nothing to further investigate the cause of the increase. *Id.* at 779, 25 P.3d at 92.

On appeal, the hospital contended that "the district judge abused its discretion in granting a new trial to the Sheridans because a causal link was not established between the alleged negligence of St. Luke's and Cal's injuries." *Id.* at 783, 25 P.3d at 96. In upholding the district court's conclusion that there was sufficient evidence of a causal link, we stated:

> The district judge's conclusion that the causal link had been established was based on expert testimony regarding the standard of care, medical research and knowledge of the impact of high bilirubin levels in a newborn and expert testimony regarding the long term damage that can be caused by those high bilirubin levels. Therefore, we find this conclusion was reached by an exercise of reason.

*Id.* at 783-84, 25 P.3d at 96-97. Thus, there was expert testimony as to the injury that can be caused by the failure to treat jaundice in a newborn.

The hospital also contended that its motion for a directed verdict should have been granted because "the record contains no medical testimony to link the breach of the standard of care by the nursing staff in the first hospital admission to the damage that may have been caused from hyperbilirubinemia and the diagnosis of kernicterus." *Id.* at 785, 25 P.3d at 98. This Court held that "the testimony and evidence in the record present[ed] a chain of circumstances from which proximate cause can be reasonably and naturally inferred." *Id.* at 786, 25 P.3d at 99. As noted above, there was expert testimony as to the consequences of failing to treat high bilirubin levels in a newborn. There was also expert testimony that "high bilirubin levels can be successfully treated by the use of bili lights and blood exchange transfusions." *Id.*

In holding that the jury could infer from the chain of circumstances that the nurses' negligence, which led to a failure to treat Cal's condition, was a proximate cause of the kernicterus, which is a form of cerebral palsy associated with a neonatal history of elevated serum bilirubin and consequent jaundice, we stated:

> There was testimony that jaundice showing within the first 24 hours is pathologic and requires further evaluation such as a serum bilirubin measurement. Evidence was also presented that high bilirubin levels can be successfully treated by the use of bili lights and blood exchange transfusions. There was no dispute that jaundice appeared in Cal within 24 hours of his birth. Nurses Sater and Brown testified that the hospital nurses breached their standard of care by not notifying Dr. Jambura when the jaundice appeared, not charting with particularity the progression of the jaundice, not noting the possible blood incompatibility problems with the mother and child, and by sending the Sheridans home from the hospital with information on physiologic jaundice (normal jaundice) but not warning them that Cal's jaundice was abnormal. Cal was later re-hospitalized with hyperbilirubinemia and was later diagnosed with kernicterus, a form of cerebral palsy associated with a neonatal history of elevated bilirubin, a symptom of which is jaundice. Although the hospital's actions were limited to the first 36 hours of life, and it was days later before the high bilirubin levels were measured, a jury could reasonably and naturally infer from the chain of circumstances that a breach of the standard of care in the first hospital stay proximately caused Cal's injuries.

*Id.*

The baby in *Sheridan* suffered the type of injury that was the normal progression of his untreated jaundice. Based upon expert testimony as to the diagnosis of his injury, expert testimony that such injury is caused by the failure to promptly treat jaundice such as he had, and

48

expert testimony that the injury can be prevented by prompt treatment, a jury could reasonably infer that the nurses' failure to properly chart the increasing severity of Cal's jaundice and their failure to notify the pediatrician of his condition before his discharge from the hospital was a proximate cause of his subsequent injury. However, the issue in *Sheridan* was not what caused the jaundice, the medical condition that, when untreated, resulted in the injury. *Sheridan* does not stand for the proposition that expert medical testimony is unnecessary regarding the external cause of a medical condition.

The majority also cites *Formont v. Kircher*, 91 Idaho 290, 420 P.2d 661 (1966), in which we reversed the trial court's determination that causation had not been proved. In that case, the plaintiff suffered a compound fracture in which "[t]he bones of the fracture were forced through the clothing and boot which plaintiff was wearing and into the barnyard earth which contained manure and other debris." *Id.* at 292, 420 P.2d at 663. He was initially treated by a physician, who placed a cast on his leg, and then was treated by the defendant physician. An infection developed in the plaintiff's leg which went untreated, ultimately causing the loss of the leg. The defendant physician knew that infection could develop rapidly with this type of injury, *id.* at 295, 420 P.2d at 666, but he failed to prescribe antibiotics, *id.* at 293, 420 P.2d at 664, failed to examine the plaintiff when his wife telephoned and reported symptoms consistent with an infection, *id.*, and failed to take action after examining the plaintiff and noting an odor in the drainage from the under the cast that indicated there was an infection, *id.* "The trial court in effect did find proximate cause from the chain of circumstances. However, because the defendant did not have the full care of plaintiff, the court concluded there was no proof of proximate cause." *Id.* at 299, 420 P.2d at 670. We stated that "[t]he principal question presented by this appeal is whether the trial court erred in finding that 'the care or lack of care by the defendant for plaintiff was not established to be the proximate cause of the loss of plaintiff's leg.'" *Id.* at 296, 420 P.2d at 667. We held that there can be more than one proximate cause and that "[t]he negligence of the defendant concurred in the final result, and the trial court was in error in its conclusion that a causal relationship was not established." *Id.*

In both *Sheridan* and *Formont*, we held that where there is a failure to treat a medical condition and the patient sustains an injury that is the natural consequence of such failure to treat, the trier of fact can conclude from the chain of circumstances that the failure to treat caused the injury without expert testimony that the medical condition caused the injury. In the present

49

case, the issue is the cause of the medical condition, not whether an untreated medical condition, such as an infection, caused a particular injury.

We have previously held that a lay witness is not competent to testify as to the cause of a medical condition. *Harrison*, 147 Idaho at 651, 214 P.3d at 637; *Swallow*, 138 Idaho at 597, 67 P.3d at 76; *Bloching v. Albertson's, Inc.*, 129 Idaho 844, 846, 934 P.2d 17, 19 (1997); *Evans*, 118 Idaho at 214, 796 P.2d at 91; *Flowerdew v. Warner*, 90 Idaho 164, 172, 409 P.2d 110, 115 (1965). If a lay person is not competent to testify as to the cause of a medical condition, then the jury is likewise unable to determine the cause of a medical condition without expert testimony as to what was the cause, particularly where there is more than one potential cause. We have never held that a lay person is competent to testify as to the external cause of a medical condition, or that the jury could determine the external cause of the condition without expert testimony.

Under the majority's "new rule," opinion testimony as to the cause of Ms. Nield's infections would be inadmissible. The majority would apparently prefer that the jury reach its decision as to the cause of the infections based upon sympathy and the temporal relationship (she became infected while at PCRC).

## V.
### In Order to Hold Dr. Coffman's Opinions Inadmissible, the Majority Ignores Our Prior Precedents, Adopts an Illogical Rule that an Expert's Opinion Cannot Be Based upon Facts Already in the Record, and Assumes the Role of Being Medical Experts.

Ms. Nield filed a motion to strike portions of Dr. Coffman's affidavit, but the district court did not rule on the motion. After granting PCRC's motion for summary judgment, the court stated that "[b]ased on that ruling, there is no need for this Court to address the Motions to Strike filed by the Plaintiff." Ms. Nield filed a motion for reconsideration, but in that motion she did not raise the court's failure to rule on her motion to strike.

This Court's rule has been that it will not decide on appeal issues that were not decided by the district court. As the author of the majority opinion in this case wrote in *Montalbano v. Saint Alphonsus Regional Medical Center*, "It is well established that in order for an issue to be raised on appeal, the record must reveal an adverse ruling which forms the basis for an assignment of error." 151 Idaho 837, 843, 264 P.3d 944, 950 (2011); *accord Rhodehouse v. Stutts*, 125 Idaho 208, 213, 868 P.2d 1224, 1229 (1994). In this case, the majority is willing to ignore this rule.

50

The majority then states, "Although Ms. Nield did not specifically raise on appeal the district court's failure to act upon the motion to strike portions of Dr. Coffman's affidavit, she submitted substantial argument in her opening brief on appeal that Dr. Coffman's testimony was speculative and should have been disregarded." I have attached the entire argument portion of Ms. Nield's brief as Appendix A to my dissent, to show what the majority contends is "substantial argument" challenging the admissibility of Dr. Coffman's affidavit. Interestingly, none of the portions of his affidavit that Ms. Nield labels as speculative were relied upon by the district court in reaching its opinion.

As the author of the majority opinion in this case wrote in *Gallagher v. State*, 141 Idaho 665, 115 P.3d 756 (2005), "In order to be considered by this Court, the appellant is required to identify legal issues and provide authorities supporting the arguments in the opening brief." *Id.* at 669, 115 P.3d at 760 (citation omitted). In *Taylor v. AIA Services Corp.*, 151 Idaho 552, 261 P.3d 829 (2011), the author of the majority opinion in this case wrote, "It is well established that this Court will not consider an issue raised on appeal if the error complained of is not identified, or if the issue is not supported by cogent argument and authority, in the opening brief." *Id.* at 568, 261 P.3d at 845.

The portion of the appellant's brief in *Taylor* that was found lacking of sufficient argument to be considered was as follows:

> The court erred and abused its discretion when it made the following findings which were not based upon evidence in the record: that the statute of limitations did not apply. *Noyes,* 255 B.R. [588], at 602 [ (Bankr.D. Idaho 2000) ]; I.C. §§ 5–237; 5–224; 5–237; that Reed was not more innocent; that Reed was not justifiably ignorant, and that Reed was in a position to have intimate knowledge of AIA's finances (among other findings in both orders not supported by the evidence); and when the court refused to address all of Reed's arguments and objections in both motions. (R. Vol. XLV–XLVI, p. 8838–52, 9014–24.) At a minimum, for these reasons and all the reasons asserted in this Brief, the court abused its discretion and erred when it did not at least find an issue of fact precluding partial summary judgment in favor of Connie and Beck and when it failed to consider all of Reed's arguments and the evidence submitted in support of those arguments. Should the Court not enter partial summary judgment in favor of Reed, the Court should order all arguments to be considered and fully and fairly evaluated with the evidence on remand.

*Id.* In holding that the above-quoted portion of the appellant's brief was insufficient for this Court to consider the issues raised, the author of the majority opinion wrote:

51

As to Reed Taylor's claims concerning ignorance, innocence and knowledge, he appears to be suggesting that there were disputed issues of material fact concerning the justifiable ignorance exception to illegality that should have precluded granting summary judgment. However, this is only a guess, and Reed Taylor provides no argument or any citation to authority on this issue. As to whether the district court refused to address all of Reed Taylor's arguments and objections in "both motions" (presumably Respondents' motion for partial summary judgment and Reed Taylor's motion for reconsideration), Reed Taylor again provides no explanation or argument and merely cites to the district court's Opinion and Order granting partial summary judgment and Opinion and Order denying his motion for reconsideration. Therefore, we decline to consider these issues.

*Id.*

Thus, to raise an issue, it must be supported by cogent **argument and authority** in the opening brief. As this Court explained in *Minor Miracle Productions, LLC v. Starkey*, 152 Idaho 333, 271 P.3d 1189 (2012):

An appellant's initial brief must include an argument section, which "shall contain the contentions of the appellant with respect to the issues presented on appeal, the reasons therefor, with citations to the authorities, statutes and parts of the transcript and the record relied upon." Idaho App. R. 35(a)(6). Even in cases where a party has explicitly set forth an issue in its brief, we have held that:

**[I]f the issue is only mentioned in passing and not supported by any cogent argument or authority**, it cannot be considered by this Court. *Inama v. Boise County ex rel. Bd. of Comm'rs*, 138 Idaho 324, 330, 63 P.3d 450, 456 (2003) (refusing to address a constitutional takings issue when the issue was not supported by legal authority and was only mentioned in passing).
Where an appellant fails to assert his assignments of error with particularity and to support his position with sufficient authority, those assignments of error are too indefinite to be heard by the Court.

*Id.* at 337, 271 P.3d at 1193 (emphasis added).

In the argument portion of her opening brief, Ms. Nield did not mention her motion to strike, nor did she state that any portion of Dr. Coffman's affidavit was inadmissible. With reference to Dr. Coffman's affidavit, there was no argument as to its admissibility, nor did Ms. Nield cite any authority supporting any contention that it was inadmissible. Although the majority contends that she "submitted substantial argument in her opening brief on appeal that Dr. Coffman's testimony was speculative and should have been disregarded," analysis will show that her argument would have been insufficient under our standard that existed prior to this case

and that the majority raises its own objections to Dr. Coffman's affidavit rather than simply addressing those allegedly raised by Ms. Nield.

Ms. Nield asserted: "Contrary to the accepted negative test results, the District Court, instead, gave the inference that Ms. Nield was a carrier and was potentially infected with MRSA and PA at the time of her admission. The District Court apparently based its decision on Dr. Coffman's unfounded speculation." Although Ms. Nield does not specify the alleged "unfounded speculation," it is apparently the same as her later reference to "Dr. Coffman's unfounded conclusion that not all of the wounds were cultured and that Ms. Nield may have gotten MRSA or PA from visitors."

With respect to the alleged speculation that not all of Ms. Nield's wounds were cultured, she apparently refers to the culture done at the Hospital before she was admitted to PCRC. Ms. Nield does not provide the facts upon which she bases this assertion. The history and physical report prepared regarding her admission to the Hospital on August 21, 2007, stated: "There was superficial ulcerations around much of the distal lower leg. The largest being posteriorly, approximately 6 to 7 cm. There was granulation tissue and vascular tissue on all of these." A laboratory report of a culture done from a swab taken on the day of her admission stated that the source was "WOUND, LEFT LEG." In his affidavit, Dr. Coffman stated that the laboratory report did not indicate whether swabs were taken from all four of Ms. Nield's wounds instead of just one of them. He stated:

> The August 21, 2007 wound culture does not rule out the possibility Ms. Nield was colonized or infected with MRSA or pseudomonas. The records do not indicate whether a swab was taken from each of Ms. Nield's four wounds. It is possible Ms. Nield had MRSA and/or pseudomonas in one or more, but not all of her wounds. As such, it is possible the swab was taken from one of the wounds in which she did not have MRSA and/or pseudomonas.

Ms. Nield argued in the district court that although the laboratory report stated that the source of the swab was "WOUND, LEFT LEG" rather than "ALL WOUNDS, LEFT LEG," it was pure speculation to assume that the swabs had not been taken from all of the wounds. According to Ms. Nield, the use of the singular "wound" obviously meant the plural "all wounds," and any assumption to the contrary was pure speculation. She did not present any evidence that the laboratory typically used the singular to refer to the plural, nor did she present any evidence that it was the standard practice of the Hospital to swab all wounds.

53

With respect to Dr. Coffman's statement that Ms. Nield may have contracted infections from visitors, Dr. Coffman stated: "Any time Ms. Nield came in contact with a visitor, left the Pocatello Care and Rehab facility, or was seen by a non Pocatello Care and Rehab medical provider, she was potentially exposed to MRSA and/or pseudomonas. An unknown but potentially significant number of medical workers are MRSA colonized." Ms. Nield does not explain why this statement is unfounded speculation, nor does she point to any expert testimony that contradicts it.

Ms. Nield also stated that "[t]he District Court improperly gave PCRC the inference, instead of Ms. Nield, based on the speculation proffered by Dr. Coffman, that the testing done by PMC may have produced a false negative." She does not discuss any facts regarding the false negative or present any argument as to why whatever Dr. Coffman said about it constituted speculation. In his affidavit, Dr. Coffman explained his experience, training, and education regarding how swabs are cultured, which was that not all micro-organisms are grown out. He stated:

> Based upon my experience, training and education, a person performing a wound or fluid culture will not identify every micro-organism isolated, but instead, will identify only the two or three most dominant micro-organisms found in the sample. The dominant isolates are then placed on culture plates and grown out over the course of one or two days to allow for identification. A technician does not culture every micro-organism from a wound or fluid culture because of the fact there could be dozens and dozens of microorganisms from one wound culture.

Dr. Coffman then explained why Ms. Nield's August 21, 2007, wound culture may have produced a false negative due to the multiple micro-organisms that would have been in her wounds. He stated:

> It is possible Ms. Nield had MRSA and/or pseudomonas in her swabbed leg wound, but that the culture did not grow out and identify these bacteria, resulting in a false negative. Due to her condition as of August 21, 2007, (chronic open wounds, unsanitary conditions, high susceptibility to infection and a lack of antibiotic treatment), Ms. Nield would be expected to have a whole host of bacteria within her wet leg wounds. A wound culture taken from one of these wounds would include possibly dozens and dozens of different microorganisms. Faced with such a wound culture, only the two or three dominant micro-organisms would be grown out for identification. It is very possible MRSA and/or pseudomonas were present in the wound that was cultured on August 21, 2007, but were not the dominant microorganisms and were not grown out.

54

Ms. Nield did not present any evidence disputing Dr. Coffman's explanation about how cultures are typically done, nor did she present any evidence that the Hospital did it in some other manner. An expert's explanation of how a procedure is typically done is not speculation. Ms. Nield likewise did not present any evidence disputing Dr. Coffman's statement as to the likelihood of there being many types of micro-organisms within Ms. Nield's wounds, nor did she explain why this would be speculation.

The above are the only parts of Dr. Coffman's testimony about which Ms. Nield could conceivably have presented "substantial argument" in her opening brief. The majority did not address any of those issues that she allegedly raised. Rather, the majority addressed other aspects of Dr. Coffman's testimony that it did not like. The majority has now adopted a "new rule" regarding raising issues on appeal. If an appellant characterizes some parts of an expert's opinion as being speculative, this Court is free to raise other objections to the expert's testimony and decide them. However, I would not recommend that any appellant rely upon this "new rule" as subsequent cases will probably show that it is confined to this case. The majority is now willing to ignore the above-stated rules for appellate review in order to rule that portions of Dr. Coffman's affidavit are inadmissible. As will be shown, the majority's holding that the opinions are inadmissible is clearly wrong.

**(a) Lack of screening for MRSA.** Ms. Nield was admitted to the Hospital on August 21, 2007, and she was discharged on August 25, 2007. The typed discharge summary, signed by Dr. Ryan Zimmerman, had on its last page a typewritten note stating, "MRSA screen negative." In his affidavit, Dr. Coffman explained that there are no medical records showing that Ms. Nield was screened for MRSA at the Hospital prior to her admission to PCRC. Therefore she could have been colonized for MRSA at the time she was admitted to PCRC and may have become infected as a result of that colonization. He stated:

> 13. People may also be screened for MRSA to identify individuals who are MRSA colonized. A MRSA screen, unlike a culture, does not look to detect infection, but rather, looks for the presence of an organism generally. In 2007, the most widely available form of MRSA screening was nares culturing, which looks for MRSA colonization in a person's nostrils. These nares screenings are only able to identify 60-70% of MRSA colonized individuals, while another 10-15% can be identified through perineal or rectal culturing. Screening incoming patients for MRSA was not common practice as of August 2007, and was not a part of the standard of care.

55

14. I have not seen any records of MRSA screening for Ms. Nield prior to her admission to Pocatello Care and Rehab. I note that the August 25, 2007 discharge summary from Portneuf Medical Center includes a handwritten note that a MRSA screen was negative. The August 25, 2007 Discharge Summary is attached hereto as Ex. C. However, there are no records of any MRSA screen. Instead, the only MRSA diagnostic record I have found prior to Ms. Nield's admission to Pocatello Care and Rehab is the August 21, 2007 culture. If a MRSA screen was done, a report would have been produced and made a part of the record. Based upon the records, it appears Dr. Zimmerman's reference to a negative MRSA screen is referring to the culture taken of Ms. Nield's wound on August 21, 2007, and not an actual MRSA screening. Based on the lack of any MRSA screen report, it is fair to assume that a MRSA screen was not performed. If Ms. Nield was not screened for MRSA, it is not possible to determine if she was MRSA colonized at the time she was admitted to Pocatello Care and Rehab on August 25, 2007.

All persons with medical degrees do not have the same level of expertise in all areas of medicine. If they did, there would be no need for specialists. Dr. Zimmerman was a family practice resident. There is nothing in the record that shows he knew what a "MRSA screening" was. We cannot assume that he had the same level of expertise in infectious disease as does Dr. Coffman, who is board certified in that specialty and has practiced it for twenty years.

Dr. Coffman stated, "In 2007, the most widely available form of MRSA screening was nares culturing, which looks for MRSA colonization in a person's nostrils." A physician would not look for MRSA colonization in a person's nostrils by shining a light up the person's nose to see if there are any little critters running around in there. A nares culture would produce medical records because the nostrils would be swabbed and then the swabs cultured in the laboratory to see if they grew MRSA bacteria. Once that was done, there would be a written laboratory report stating the outcome. Dr. Coffman deduced that because there was no laboratory report of a nares culture, none had been performed. The majority's criticism of his conclusion shows that the majority does not understand the concept of deductive reasoning.

The majority also states that it is "pure speculation" that there was no laboratory report just because Dr. Coffman could not find one. A list of the records he received was attached to his affidavit. That list included "Laboratory reports" from the Hospital. A MRSA screen would have produced a laboratory report from the Hospital. Dr. Selznick listed the reports he reviewed. His list did not include any laboratory record indicating a MRSA screen had been done. Ms. Nield certainly did not contend in the district court that Dr. Coffman had not received all of the

records or that there was a laboratory report showing the results of the nares culture, nor did she produce the phantom report. The alleged missing report is simply a figment of the majority's imagination and pure speculation.

The majority also states that Dr. Coffman's contention that no MRSA screen had been done "played a significant part of the district court's decision to strike Dr. Selznick's affidavit." That statement is simply untrue. The only possible reference to the lack of MRSA screening in the district court's memorandum decision granting summary judgment was the statement: "While at PMC, at least one of her open wounds was tested for MRSA and pseudomonas, and the test results were negative for infection. At the time, no other testing was done to determine the presence of MRSA." The court never mentioned MRSA screening in its analysis of the admissibility of Dr. Selznick's opinion as to causation. That court's decision was based solely upon the fact that Dr. Selznick failed to conduct the analysis required in *Weeks*.

**(b) Dr. Coffman did not opine as to how Ms. Nield contracted her infections.** The majority appears to hold that Dr. Coffman's testimony is speculative because he could not determine the source of Ms. Nield's infections. It recites that contention by Ms. Nield and then states:

> That is, although he postulated quite a number of potential sources of infections, he could not state that she contracted the infections from any of the possible sources. "Expert opinion that merely suggests possibilities, not probabilities, would only invite conjecture and may be properly excluded." *Slack v. Kelleher*, 140 Idaho 916, 923, 104 P.3d 958, 965 (2004).

Assuming that the quotation from *Slack* constitutes the majority's agreement with Ms. Nield's contention, both the majority and Ms. Nield fail to understand the significance of the burden of proof, and the majority's apparent holding contradicts our existing case law.

Ms. Nield had the burden of proving that the negligence of PCRC was a proximate cause of her infections. PCRC was not required to disprove causation or to prove how Ms. Nield became infected. The *Slack* case does not support the majority's apparent ruling. Ms. Slack sued the Kellehers to recover damages for injuries she had suffered in a traffic accident. "Because there was evidence that Slack had suffered permanent injuries in the accident, her life expectancy was relevant to the issue of damages." *Id.* at 922-23, 104 P.3d at 964-65. Prior to the start of the trial, Kelleher's counsel stated that he had a medical expert who would testify "about general health issues with respect to Slack." *Id.* at 923, 104 P.3d at 965. "The district

57

court ruled that Kelleher could not introduce evidence that Slack's medical condition may shorten her life expectancy unless such conclusion was supported by expert opinion testimony." *Id.* Kelleher did not call its medical expert, but argued on appeal that the district court "erred in precluding the expert from testifying about Slack's poor health because it was relevant to her life expectancy." *Id.* "During the discussion [at trial] regarding the medical expert's expected testimony, Kelleher's counsel did not claim that the expert would testify that in his opinion Slack's medical condition would shorten her life expectancy." *Id.* We held that the district court did not err because: "Whether or not her heart attack or other medical conditions would shorten her life expectancy are matters beyond the competence of the average layperson or juror. Therefore, *Kelleher was required to produce expert testimony that Slack's medical condition would shorten her life expectancy*." *Id.* (emphasis added). The trial court instructs the jury as to a plaintiff's life expectancy based upon mortality tables. *Perry v. Magic Valley Reg'l Med. Ctr.*, 134 Idaho 46, 59, 995 P.2d 816, 829 (2000). A defendant has the burden of proving that a plaintiff has a shortened life expectancy. Kelleher had the burden of proving that Ms. Slack's life expectancy would be shortened due to her medical conditions. Kelleher's medical expert was not able to so testify, and so general testimony about Ms. Slack's medical conditions would have merely invited the jury to speculate as to whether such conditions would shorten her life expectancy. *Id.*

It is the plaintiff in a negligence action that has the burden of proving causation. Because the defendant does not have that burden, the defendant can offer evidence of other potential causes without having to prove that one of those potential causes was the actual cause. In *Lanham v. Idaho Power Co.*, 130 Idaho 486, 943 P.2d 912 (1997), the plaintiffs brought an action against Idaho Power Company contending that it was the cause of a fire that occurred on their property. The jury returned a verdict in favor of Idaho Power, and the Lanhams appealed. On appeal, the Lanhams contended that the district court erred in permitting Idaho Power's expert James Ashby to testify that there were various possible causes of the fire and that he could not eliminate any of the possible causes.

> He [Ashby] then testified that he had considered a number of possible causes for the fire on the property, including smoking, vehicles on the road through the fire area, campers, arson, a downed power line, and lightning. Given the weather conditions present on the day of the fire, Ashby asserted that he could not eliminate any of these possible causes. He admitted, however, that he had found no physical evidence at the fire scene to support smoking, vehicles, campers, or

58

arson as the cause of the fire. He stated that there was evidence that "a tree limb was down on the power lines, the power lines were down, at least fairly early in the fire," but he found no evidence to indicate that the downed power line actually caused the fire.

*Id.* at 492, 943 P.2d at 918. We held that the district court did not err in permitting the expert to testify about other possible causes of the fire that he could not rule out. "We hold that the trial court did not err in permitting Ashby to testify about possible causes of the fire. All reasonably likely causes of the fire were relevant because the fire's cause was a central element of both of the Lanhams' causes of action." *Id.*

The Lanhams also argued that the district court erred in permitting Ashby to testify that lightning could have struck near the area where the fire started. They argued that there was no corroborative evidence of a lightning strike on their property. *Id.* at 494, 943 P.2d at 920. We held that the lack of evidence corroborating a lightning strike was irrelevant to the issue of whether that could have happened. We stated:

> This argument, however, misses the point of Ashby's testimony. He listed several possible causes of the fire and explained why he could not definitively eliminate each of them. When he arrived at lightning as a potential source, he stated that he checked the BLM lightning strike data and that, according to his interpretation, the data indicated that lightning had moved through the general area within twenty-four hours prior to the fire. Thus, he could not rule out, on that basis, the possibility that lightning had caused the fire. He did not, as the Lanhams seem to suggest, testify that lightning had definitely struck the Lanhams' property, nor was he attempting to prove that such a strike had occurred. Ashby simply testified that he could not establish that such a strike had not occurred and thus could not eliminate lightning as a potential cause of the fire. The lack of corroborative evidence is thus irrelevant as to whether sufficient foundation was laid for Ashby's opinion.

*Id.*

Thus, the defendant is entitled to present evidence of possible causes of injury or damage other than the defendant's negligence even if the defendant cannot point to evidence showing that one or more of those other possible causes was the actual cause. As stated above, the defendant in a negligence action does not have the burden of proving causation. That is the plaintiff's burden. The majority announces a "new rule" that a defendant in a negligence action cannot offer expert testimony of other potential causes of the plaintiff's injury. Such rule is contrary to our ruling in *Lanham*, and it will tip the scales of justice in favor of Ms. Nield. Even though it is undisputed that there are other potential causes of her infections, the majority will

59

exclude expert testimony of those other causes so that the only potential cause that the jury will hear is PCRC's alleged negligence, thereby depriving PCRC of a fair trial.

**(c) Dr. Coffman's affidavit did not recite the specific facts in the record showing Ms. Nield's possible exposure to the infections.** In his affidavit, Dr. Coffman stated:

> Any time Ms. Nield came in contact with a visitor, left the Pocatello Care and Rehab facility, or was seen by a non Pocatello Care and Rehab medical provider, she was potentially exposed to MRSA and/or pseudomonas. An unknown but potentially significant number of medical workers are MRSA colonized.

The majority holds that Dr. Coffman "fails to cite any evidence in the record indicating that Ms. Nield had contact with any of these potential sources." That is correct. However, in the memorandum supporting PCRC's motion for summary judgment, its counsel listed citations to the record showing such contacts.

> 9.     During her admission at Pocatello Care and Rehab, she left the facility on various occasions, which included the following:
> 
> a.     Ms. Nield was taken to Portneuf Medical Center on August 27, 2007 to have a PICC line inserted. See Duke Aff., Ex. 11.
> 
> b.     Ms. Nield left the facility to have dental work done on October 12, 2007. See Duke Aff., Ex. 12.
> 
> c.     Ms. Nield left the facility to visit the Portneuf Medical Center's Gift shop prior to the date her wound culture indicated she had MRSA or pseudomonas. See Duke Aff., Ex. 10, p. 178-179.

> 10.     During her admission at Pocatello Care and Rehab, Ms. Nield also had numerous family members and friends visit her including Barbie Girard, Karen Morasko, Gary and Julie Toupe, Kenny and Diane Balls, Mannie Perez, Milt Escobal, Vic and Joan Adams, Janna Leo, Laurie Bills and Jay Cunningham. See Duke Aff., Ex. 10, pp. 142-147.

> 11.     Ms. Nield was also seen and treated by numerous medical professionals while she was at Pocatello Care and Rehab, that were not employed by Pocatello Care and Rehab, including Dr. Routson, Dr. Hoff, Dr. Jones, and Nurse Practitioner Diana B. Krawtz. See Duke Aff., Ex. 13.

The exhibits to Ms. Duke's affidavit referenced above were excerpts from Ms. Nield's deposition (Ex. 10), a radiology report (Ex. 11), a nursing note regarding Ms. Nield (Ex. 12), and doctors' orders related to Ms. Nield's stay at PCRC (Ex. 13). Ms. Nield did not challenge the truthfulness of any of the above statements. Her only challenge was that there was no evidence that "the visitors were MRSA or pseudomonas colonized or infected."

60

Apparently, the majority is adopting a "new rule" that all of the facts supporting an expert's opinion must be stated in that affidavit, even if they are otherwise set forth in the record and not disputed by the opposing party. Affidavits supporting and opposing a motion for summary judgment "shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." I.R.C.P. 56(e). We have previously held that an expert's opinion is inadmissible when it *is not supported* by facts in the record. *J-U-B Engineers*, 146 Idaho at 316, 193 P.3d at 863. The majority now holds that an expert's opinion is inadmissible *because it is supported* by facts in the record. The majority's new holding would prevent an expert from expressing an opinion that was not based upon facts that were within the expert's personal knowledge. The majority provides no logical explanation for that new nonsensical rule, and it illustrates the extent to which it is willing to go to justify its reversal of the district court.

**(d) Dr. Coffman's statement that MRSA was ubiquitous in facilities like PCRC.** In his affidavit, Dr. Coffman stated, "MRSA is ubiquitous within skilled nursing facilities and long term care facilities." Ms. Nield did not move to strike this portion of Dr. Coffman's affidavit, nor did she argue on appeal that it was inadmissible. The majority sua sponte objects to this statement on the ground that there is no evidence that MRSA was ubiquitous at PCRC while Ms. Nield was there.

I doubt that the majority really believes that by donning black robes it has acquired greater expertise in the area of infectious disease than that possessed by a physician who is board certified in that specialty and has practiced it for over twenty years. Nevertheless, the majority does not hesitate to express its own "expert" opinions in this area.

The majority bases its "expert" medical opinion upon the fact that Ms. Nield was the only person who became infected with MRSA while she was at the facility, although there were other patients in the facility who were infected by MRSA but had become infected prior to being admitted. In the majority's "expert" medical opinion, if MRSA was ubiquitous at PCRC, then more patients would have become infected. The majority apparently rejects any possibility that the lack of patients becoming infected with MRSA while at PCRC had anything to do with the quality of care provided at that facility.

In his affidavit, Dr. Coffman stated that MRSA, the bacteria, was ubiquitous in skilled nursing facilities and long term care facilities. He also stated: "A person may be colonized with

61

MRSA but not show signs or symptoms of infection"; "Most people who are colonized with MRSA do not develop MRSA infections"; "There are studies indicating that upwards of 25% of patients at such facilities are MRSA colonized"; and "There are numerous factors that make certain people more susceptible to developing MRSA infections, including increased age, diabetes, vascular and venous deficiencies, open wounds, previous hospital admissions, compromised immune system and lack of mobility." When Ms. Nield arrived at PCRC, she was 65 years old and had all of those risk factors with the possible exception of a compromised immune system. Ms. Nield's discharge summary from the Hospital stated, "Newly diagnosed diabetes." Her physical history when she entered the hospital stated, "The patient has arterial and venous disease and so this is more of a picture of arterial and venous disease. However, given the patient's poor circulation, she is at high risk for infectious disease and I suspect that there is some component of infectious disease here." She had open wounds, which is why she was admitted both to the Hospital and to PCRC, and she had not been mobile, due to her dislocated hip. She was transported by ambulance to the Hospital after a home health provider discovered her lying in a bed soaked with urine because she could not get up to go to the bathroom.

In addition, the majority implicitly rejects any suggestion that Ms. Nield could have been exposed to MRSA by any of her visitors, all of whom she hugged when they came to visit, or other medical personnel who visited her while at PCRC, or when she left the facility to go shopping or to the dentist. The majority simply lacks the expertise to exclude Dr. Coffman's testimony based upon the majority's "expert" medical opinions.

## VI.
### Conclusion.

In order to reverse the district court, the majority mischaracterizes our *Weeks* opinion and misstates how the district court applied that decision. The majority holds that expert testimony is not required to prove the cause of Ms. Nield's infections, even though in an unbroken string of five cases we have held that lay people are not competent to testify as to the cause of a medical condition. The majority holds that PCRC cannot offer expert testimony as to other potential causes of Ms. Nield's infections, even though such testimony has previously been held admissible by this Court, and the only apparent purpose for now excluding such testimony is to

have the jury make its decision solely upon the fact that Ms. Nield became infected while at PCRC. There is a saying that hard cases make bad law. That saying is incorrect. It is courts that make bad law in the process of deciding cases based solely upon whom they want to win or lose. A court must have the integrity to decide cases by applying the law to the facts. By applying the law to the facts in this case, the district court reached the correct result. I would affirm.

## APPENDIX A

## ISSUES ON APPEAL

1.      Whether the District Court erred in misapplying the summary judgment standard by improperly weighing the evidence and failing to give Ms. Nield all reasonable inferences from the record;

2.      Whether the District Court erred in misapplying the summary judgment standard by requiring Ms. Nield to show that she may have been a carrier of MRSA and PA but was not infected at the time of her admission; requiring Ms. Nield to show why the wound culture would not have produced a false negative; and requiring Ms. Nield to show she could only have contracted MRSA and PA while admitted at PCRC's facility;

3.      Whether the District Court erred in misapplying the substantial factor test by incorrectly concluding Ms. Nield's experts did not address when, where or how she contracted MRSA and PA and rule out other factors that could have been a substantial factor in causing Ms. Nield to contract MRSA and PA;

4.      Whether Ms. Nield is entitled to attorney's fees and costs on appeal, pursuant to Idaho Code Section 12-121 and Idaho Appellate Rules 40 and 41.

## ARGUMENT

**A.      THE DISTRICT COURT IMPROPERLY WEIGHED THE EVIDENCE AND FAILED TO GIVE MS. NIELD ALL REASONABLE INFERENCES FROM THE RECORD, THEREBY MISAPPLYING THE SUMMARY JUDGMENT STANDARD.**

The rules applying to a court's determination of summary judgment are as follows:

As we have reiterated in our recent cases, upon a motion for summary judgment, all disputed facts are liberally construed in favor of the non-moving party. **The burden of proving the absence of a material fact rests at all times upon the moving party. This burden is onerous because even "[c]ircumstantial evidence can create a genuine issue of material fact."** **Moreover, all reasonable inferences which can be made from the record shall be made in favor of the party resisting the motion.** If the record contains conflicting inferences upon which reasonable minds might reach different conclusions, **a summary judgment must be denied because all doubts are to be resolved against the moving party. The requirement that all reasonable inferences be construed in the light most favorable to the non-**

**moving party is a strict one.** Nevertheless, when a party moves for summary judgment the opposing party's case must not rest on mere speculation because a mere scintilla of evidence is not enough to create a genuine issue of fact. Notwithstanding the utility of a summary judgment, **a motion for summary judgment should be granted with caution.**

*McCoy v. Lyons*, 120 Idaho 765, 769-70, 820 P.2d 360, 364-65 (1991)[Internal citations omitted][Emphasis added]. Furthermore, it is well-established that on summary judgment, a trial court is not allowed to weigh the evidence and resolve all doubts against the movant:

> The trial court, when confronted by a motion for summary judgment, must determine if there are factual issues which should be resolved by the trier of facts. **On such a motion it is not the function of the trial court to weigh the evidence or to determine those issues.** Moreover, **all doubts must be resolved against the party moving for a summary judgment.**

*Merrill v. Duffy Reed Constr. Co.*, 82 Idaho 410, 414, 353 P.2d 657, 659 (1960)[Emphasis added]. *See also, American Land Title Co. v. Isaak*, 105 Idaho 600, 601, 671 P.2d 1063, 1064 (1983) ("A trial court, in ruling on a motion for summary judgment, is not to weigh evidence or resolve controverted factual issues."); *Idaho State University v. Mitchell*, 97 Idaho 724, 730, 552 P.2d 776, 782 (1976)(*citing, Merrill, supra*); *Meyers v. Lou*, 133 Idaho 846, 849, 993 P.2d 609, 612 (2000)("The district court may not weigh the evidence to resolve controverted factual issues.")). Additionally, "[a] motion for summary judgment should be denied if the pleadings, admissions, depositions, and affidavits raise any question of credibility of witnesses or weight of the evidence." *Merrill, supra*, 82 Idaho at 414, 353 P.2d at 659.

    1.    **The District Court improperly weighed the evidence and credibility of witnesses.**

While admitting that Dr. Selznick was qualified to render his opinions (R., p. 1236), the District Court weighed his opinions and credibility against those submitted by PCRC's expert, Dr. Coffman. The District Court also weighed and assessed the credibility of Mr. Gerber and Ms. Frederick. It is well-settled that a trial court is not allowed to weigh the evidence or assess the credibility of witnesses on summary judgment. The District Court violated this rule, again, evidenced by its own comments:

> This Court correctly determined that [PCRC's] expert, Dr. Coffman, presented admissible, credible testimony establishing that [Ms. Nield] could not demonstrate to a reasonable degree of medical certainty when, where, or how she contracted MRSA and pseudomonas.

R., p. 1295 [Emphasis supplied].

The District Court accepted Dr. Coffman's conclusion that he could not determine where Ms. Nield contracted MRSA or PA over Dr. Selznick's conclusion Ms. Nield, to a reasonable degree of probability, contracted MRSA and PA due to PCRC's conduct and omissions. This was not the District Court's role; rather, weighing the opinions of Dr. Coffman, Dr. Selznick, Ms. Frederick and Mr. Gerber was the role of the jury. Essentially, the District Court determined Dr. Selznick was less credible than Dr. Coffman,[1] finding Dr. Selznick did not address the issue whether Ms. Nield may have been a carrier of MRSA or PA, but was not infected at the time of her admission; that the testing would not have produced a false negative; and did not address why Ms. Nield could only have contracted MRSA and PA while admitted at PCRC.[2]

Not only did the District Court improperly weigh the evidence and assess the witnesses' credibility, it also wrongly concluded Dr. Selznick, Mr. Gerber and Ms. Frederick did not address the pertinent issues. Dr. Selznick, Mr. Gerber and Ms. Frederick did address how Ms. Nield contracted MRSA and PA. All of them reviewed the testing done at PMC, finding that Ms. Nield was negative for MRSA and PA prior to her admission. All of them properly relied upon the negative test results, as they had a right to do, since that was the accepted standard of care for the practice of medicine in Pocatello, Idaho. All of them reviewed the records from PCRC of Ms. Nield's treatment and the DHW records to conclude PCRC did not follow infection control procedures. All of them considered that Ms. Nield was housed with residents infected with MRSA and PA, that PCRC failed to follow proper and accepted infection prevention, was cited for its noncompliance by DHW, and that Ms. Nield tested positive for MRSA and PA November 9, 2007, over three months after she was admitted at PCRC. Dr. Selznick, Mr. Gerber and Ms. Frederick utilized and applied the proper methodologies in reaching their conclusions. R., pp. 640-653; pp. 1042-1089; pp. 1096-1106.

The District Court also improperly granted summary judgment, given that Dr. Coffman admitted he could not rule out where Ms. Nield contracted MRSA and PA. This means Dr. Coffman could not rule out that Ms. Nield contracted MRSA and PA at PCRC. That admission, which the District Court ignored in weighing the evidence, in and of itself, raised a genuine issue of material fact precluding summary judgment. Moreover, the District Court improperly refused to give Ms. Nield the inference from Dr. Coffman's admission he could not rule out that Ms. Nield got MRSA and PA from PCRC.

Further, from the abundant evidence in the record, PCRC's treatment of Ms. Nield was below the standard of care. PCRC and its staff did not wash their hands; they did not properly treat Ms. Nield's wounds; they did not properly document Ms. Nield's wounds and skin condition; they exposed Ms. Nield to MRSA and PA; and, after three months in PCRC, Ms. Nield was positive for both

---

[1] R., p. 1235.

[2] The District Court also required Ms. Nield to prove that she only contracted MRSA and PA from PCRC, which is incongruent with the "substantial factor" test case law, as will be discussed in greater detail in the remainder of this brief.

MRSA and PA. R., pp. 671-673; p. p. 739; p. 750; p. 923-927; p. 931. These facts alone would also preclude summary judgment, and the District Court committed reversible error in granting it.

### 2. The District Court did not give any reasonable inference to Ms. Nield, let alone every inference.

The District Court did not give the inference from the screening Ms. Nield had taken of her at PMC, prior to her admission to PCRC, that she was negative as a carrier and not infected with MRSA and PA. Contrary to the accepted negative test results, the District Court, instead, gave the inference that Ms. Nield was a carrier and was potentially infected with MRSA and PA at the time of her admission. The District Court apparently based its decision on Dr. Coffman's unfounded speculation. The District Court improperly endorsed that speculation, despite the fact that Dr. Coffman, again, admitted **"I can't rule out where she got it [MRSA] from."** R., pp. 1013-1014 [Emphasis added]. Further, Dr. Coffman's own affidavit amplifies that he could not determine when, where or how Ms. Nield contracted MRSA or PA: **"[I]t is not possible to determine when, where or how Ms. Nield became infected with MRSA or pseudomonas."** R., pp. 215 (¶ 28) [Emphasis supplied].

The District Court improperly gave PCRC the inference, instead of Ms. Nield, based on the speculation proffered by Dr. Coffman, that the testing done by PMC may have produced a false negative. Apparently, the District Court accepted Dr. Coffman's unfounded conclusion that not all of the wounds were cultured and that Ms. Nield may have gotten MRSA or PA from visitors. Those are inferences to which PCRC, as the movant, was not allowed under the summary judgment standard. Additionally, those inferences are not supported by the record. Dr. Coffman did not do the testing. He was only speculating about the test results. The record is appropriately silent on the testing done by PMC. It was done. It was proper. It was negative for both MRSA and PA.

Ms. Nield, not PCRC, was entitled to all reasonable inferences, such as: (1) that she was not colonized or infected with MRSA or PA, based on the negative test results from the testing done at PCRC; (2) that the testing did not prove a false negative; (3) that all of her wounds were cultured; (4) that her treating physician, Dr. Selznick, who followed the standard of care, can rely on test results negative for MRSA and PA; (5) that it was documented that Ms. Nield was exposed to MRSA and PA during her stay at PCRC; (6) that PCRC breached the standard of care in failing to adhere to the standard of care for control of infectious diseases, which was documented by DHW; and (7) that Dr. Selznick had a right to rely on the positive test results of MRSA and PA in November, 2007, to draw the conclusion that PCRC's conduct was a substantial factor in causing Ms. Nield's MRSA and PA infections.

The District Court also failed to consider the fact that PCRC never tested Ms. Nield for MRSA and PA prior to or after her admission. Dr. Coffman's defense to that was that Ms. Nield was never screened in her nares or other parts of her body, yet admitted that that was not the standard of care. R., p. 212 (¶13);

Tr., p. 29, L.14 to p. 30, L. 3. The District Court also should have considered the relevant facts that: (1) PCRC and its medical care providers failed to follow infection prevention protocols, which its providers admitted; (2) PCRC was cited for violating regulations requiring prevention of the spread of disease, while Ms. Nield was a resident there; (3) through Ms. Nield's undisputed deposition testimony[3], Ms. Nield was housed next to a resident infected with MRSA, and exposed to a resident with PA; and (4) Ms. Nield's testimony that she witnessed nurses leaving the MRSA infected resident's room without washing their hands and failing to wear gloves before coming to her room. This the District Court clearly did not do.

In addition, PCRC's deficiencies were also described by Ms. Nield's experts, Mr. Gerber and Ms. Frederick. Both Mr. Gerber and Ms. Frederick concluded that, upon reviewing the same records Dr. Selznick and PCRC's expert, Dr. Coffman reviewed, PCRC failed to follow infection prevention policies that led to Ms. Nield's contracting MRSA and PA. As stated by this Court in *Sheridan v. St. Luke's Reg'l Med. Ctr.*, 135 Idaho 775, 785-86, 25 P.3d 88, 98-99 (2001):

> Furthermore, according to our precedent, **proximate cause can be shown from a "chain of circumstances from which the ultimate fact required to be established is reasonably and naturally inferable."**
>
> * * *
>
> **[A plaintiff] was not required to prove his case beyond a reasonable doubt, nor by direct and positive evidence. It was only necessary that he show a chain of circumstances** from which the ultimate fact required to be established is reasonably and naturally inferable. **"If the rule of law is as contended for by defendant and appellant, and it is necessary to demonstrate conclusively and beyond the possibility of a doubt that the negligence resulted in the injury, it would never be possible to recover in a case of negligence in the practice of a profession which is not an exact science."** [Internal citations omitted] [Emphasis added].

(quoting, *Formant v. Kircher*, 91 Idaho 290, 296, 420 P.2d 661, 667 (1966)). The District Court also failed to follow the well-settled principle that the burden of proof in a civil case is by "a fair preponderance of the evidence." *Miller v. Belknap*, 75 Idaho 46, 52, 266 P.2d 662, 665 (1954). The proper test is whether, reviewing the record and giving Ms. Nield all reasonable inferences therein, Ms. Nield can show, through a chain of circumstances, PCRC's negligence and breach of the standard of care were a substantial factor in her contracting MRSA and PA. Ms. Nield has met this. In fact, on that, Dr. Coffman agrees, because he could not

---

[3] PCRC never offered any evidence below contradicting Ms. Nield's testimony that she was housed next to, and exposed to residents with MRSA and PA.

68

rule out PCRC's conduct as a cause of Ms. Nield's infections. It is patently clear that the District Court improperly granted summary judgment.

**B.    THE DISTRICT COURT MISAPPLIED THE SUMMARY JUDGMENT STANDARD IN CONCLUDING MS. NIELD WAS REQUIRED TO ESTABLISH SHE WAS NOT INFECTED AT THE TIME OF HER ADMISSION; THAT HER WOUND CULTURES DID NOT PRODUCE A FALSE NEGATIVE; AND THAT SHE ONLY COULD HAVE CONTRACTED MRSA AND PA AT PCRC.**

The District Court required Ms. Nield to establish proximate cause, by establishing that she may have been a carrier of MRSA and PA but was not infected at the time of her admission; requiring Ms. Nield to show why the wound culture would not have produced a false negative; and requiring Ms. Nield to show she could *only* have contracted MRSA and PA while admitted at PCRC's facility. R., p. 1235. The District Court committed reversible error, as it failed to follow the substantial factor test.

It is well-settled that the "question of proximate cause is one of fact and almost always for the jury." *Cramer v. Slater*, 146 Idaho 868, 875, 204 P.3d 508, 515 (2009). The District Court misapplied Ms. Nield's burden to establish that jury question. Ms. Nield was not required to establish proximate cause by showing that she only contracted MRSA and PA from PCRC; rather, Ms. Nield need only establish proximate cause, through a chain of circumstances, that PCRC's actions and omissions were a substantial factor in bringing about her injuries. *Coombs v. Curnow*, 148 Idaho 129, 140, 219 P.3d 453, 464 (2009) [Emphasis added]; *Weeks v. EIRMC*, 143 Idaho 834, 839, 153 P.3d 1180, 1185 (2007). Proximate cause "**can be shown by a 'chain of circumstances from which the ultimate fact required to be established is reasonably and naturally inferable.'**" *Weeks, supra*, 143 Idaho at 839, 153 P.3d 1185, *citing, Sheridan, supra*, 135 Idaho at 785, 25 P.3d at 98 [Emphasis added].

Additionally, the District Court ignored the substantial factor test when it, improperly, concluded that Ms. Nield may have been a carrier and not infected when she was admitted to PCRC and the testing done by PMC may have produced a false negative. Apparently, the District Court accepted Dr. Coffman's speculation Ms. Nield may have been a carrier, based on the lack of screening. What is patently erroneous is that the District Court accepted this from Dr. Coffman, despite the fact that he admitted it was not the standard of care to do any screening. R., p. 212; Tr., p. 29, L. 14 to p. 30, L. 3. The District Court further accepted Dr. Coffman's unfounded conclusion that not all of the wounds were cultured and that Ms. Nield may have gotten MRSA or PA from visitors. Again, those are inferences to which PCRC, as the movant, was not allowed under the summary judgment standard. Additionally, the record does not support those inferences, since Dr. Coffman did not do the testing, and speculated about the test results. The record is appropriately silent on the testing done by PMC. There is no dispute PMC tested Ms. Nield for MRSA and PA, that it was proper and that she was negative for both MRSA and PA.

**C. THE DISTRICT COURT COMMITTED ERROR IN MISAPPLYING THE SUBSTANTIAL FACTOR TEST BY CONCLUDING MS. NIELD'S EXPERTS DID NOT ADDRESS WHEN, WHERE OR HOW SHE GOT MRSA AND PA AND BY REQUIRING MS NIELD'S EXPERTS TO RULE OUT OTHER FACTORS THAT COULD HAVE BEEN A SUBSTANTIAL FACTOR IN CAUSING HER TO CONTRACT MRSA AND PA.**

The District Court erroneously decided, after weighing Dr. Selznick's, Mr. Gerber's and Ms. Frederick's affidavits, that Ms. Nield did not establish a genuine issue of material fact. The District Court not only improperly weighed those affidavits and assessed their credibility, it also misapplied the substantial factor test. The record shows that Ms. Nield established a chain of circumstances and met the substantial factor test.

### 1. Standard for expert testimony.

Idaho Rules of Evidence 702 and 703 govern the admissibility of expert testimony. Rule 702 provides as follows:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Rule 703 provides, in pertinent part, as follows:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence in order for the opinion or inference to be admitted.

Expert testimony in medical malpractice cases is admissible when:

> '[T]he expert is a qualified expert in the field, the evidence will be of assistance to the trier of fact, experts in the particular field would reasonably rely upon the same type of facts relied upon by the expert in forming his opinion, and the probative value of the opinion testimony is not substantially outweighed by its prejudicial effect.'

*Coombs, supra*, 148 Idaho at 140, 219 P.3d at 464 (*quoting, Ryan v. Beisner*, 123 Idaho 42, 47, 844 P.2d 24, 29 (Ct. App. 1992)). Admissibility of an expert's opinion "depends on the validity of the expert's reasoning and methodology, rather than his or her ultimate conclusion." *Id.* Moreover, where an expert's reasoning or methodology is scientifically sound and "based upon a 'reasonable degree of medical probability'" and not a mere possibility, such testimony will assist the trier of fact. *See, Bloching v. Albertson's, Inc.*, 129 Idaho 844, 846-47, 934 P.2d 17, 19-20 (1997) (*quoting, Roberts v. Kit Mfg. Co.*, 124 Idaho 946, 948, 866 P.2d 969, 971 (1993 )).[4]

In *Weeks, supra*, a medical malpractice case, this Court held that a district court erred in granting summary judgment, when the district court excluded expert testimony. This Court reasoned that where the expert based his opinions on his experience and research, and made inferences from facts known to him, it was reversible error to grant summary judgment. *Weeks, supra*, 143 Idaho at 839-40, 153 P.3d at 1185-86. Also in *Weeks*, this Court followed the well-settled principle that to survive summary judgment, the plaintiff does not need to rule out all factors, but only needs to establish proximate cause by showing, through a chain of circumstances, the defendant's actions and omissions were a <u>substantial factor</u> in bringing about the injuries. *Id.*, 143 Idaho 834, 839, 153 P.3d 1180, 1185 (2007). the [sic] District Court, like the one in *Weeks*, committed reversible error in weighing and assessing the credibility of Dr. Selznick's, Mr. Gerber's and Ms. Frederick's opinions and ignoring other admissible facts.

**2.  Ms. Nield submitted admissible expert opinions and other evidence, thereby satisfying the substantial factor test.**

The District Court acknowledged that Dr. Selznick was qualified to provide expert testimony. Despite making that finding, the District Court stated Dr. Selznick could not offer opinions that will assist the jury. R., p. 1236. To the contrary, the record shows Dr. Selznick's opinions are admissible under *Coombs* and *Weeks*, such that Ms. Nield met the substantial factor test. First, Dr. Selznick relied upon facts that other experts rely upon; that is, he reviewed Ms. Nield's medical records, including her negative test results in August of 2007, and the positive results taken after her admission in November, 2007; he reviewed the DHW records establishing PCRC's failure to follow infection prevention protocols; he reviewed PCRC's records of its treatment, or lack thereof, of Ms. Nield; and he reviewed the DHW records to find that PCRC was housing MRSA and PA infected residents. R., pp. 1047-1089. Based on his experience and research, like the expert witness in *Weeks*, Dr. Selznick properly concluded Ms. Nield contracted MRSA and PA due to PCRC's actions and omissions. Again, Ms. Nield does not have to establish she only could have contracted MRSA or PA

---

[4] In *Bloching*, this Court disallowed a physician's testimony that was "possible" and not based upon a "reasonable degree of medical probability." *Id.*, 129 Idaho at 846, 934 P.2d at 19. Dr. Selznick based his opinions on a reasonable degree of medical certainty (R., p. 1043; p. 1063-64). Further, Ms. Frederick based her opinions to a reasonable degree of nursing certainty (R., p. 649). Finally, Mr. Gerber based his opinions on a reasonable degree of certainty (R., p. 1106).

from PCRC, only that PCRC's conduct was a substantial factor in causing her injuries. Dr. Selznick's opinions establish Ms. Nield's [sic] met that test, and, at the very least, raised genuine issues of material fact.

Additionally, the District Court misconstrued its role in deciding the motion for summary judgment. The District Court mistakenly determined it was acting as a "gate keeper" a role associated with *Daubert*. It is well-established that Idaho has not adopted *Daubert*. *Weeks, supra,* 143 Idaho at 838, 153 P.3d at 1184.[5] *See also, Swallow v. Emergency Med. of Idaho,* 138 Idaho 589, 595 n.1, 67 P.3d 68,74 (2003); *State v. Merwin,* 131 Idaho 642, 646, 962 P.2d 1026, 1030 (1998)). I.R.E. 702 and 703 are the standards by which a court is to determine the admissibility of an expert's opinions. The District Court misapplied I.R.E. 702 and 703 by trading the "methodology" or "reasoning" element a physician would use, i.e review medical records, performing research and basing an opinion on experience with the unfounded speculations of Dr. Coffman, that Ms. Nield may have been a carrier but was not infected, and that her wound culture may have been a false negative. I.R.E. 702 and 703 only required Dr. Selznick, Mr. Gerber and Ms. Frederick to apply their experience and review of records to satisfy the methodology element of the rule, which they all did.

Also, the District Court misconstrued the substantial factor test in requiring Ms. Nield to show she **could only** have contracted MRSA and PA from PCRC. Presumably, the District Court got this from this Court's decision in *Weeks*, where the Court stated the following dicta in relation to a **differential diagnosis case**:

> The Ninth Circuit allowed for the use of differential diagnosis under *Daubert* to establish reliability of an expert's opinion. *Clausen,* 339 F.3d at 1057-58. Differential diagnosis involves an analysis of all hypotheses that might explain the patient's symptoms or mortality. *Id.* After identifying all of the potential causes of symptoms, the expert then engages in a process of eliminating hypotheses in order to reach a conclusion as to the most likely cause. *Id.* When using differential diagnosis a district court is justified in excluding the expert's testimony if the expert fails to offer an explanation why an alternative cause is ruled out. *Id.*

*Weeks,* supra, 143 Idaho at 849, 153 P.3d 1185. **This is not a differential diagnosis case**, and Ms. Nield was not required to eliminate any other causes and

---

[5] As this Court in *Weeks, supra,* 143 Idaho at 838, 153 P.3d at 1184, stated,

The Court has not adopted the *Daubert* standard for admissibility of an expert's testimony but has used some of *Daubert's* standards in assessing whether the basis of an expert's opinion is scientifically valid. *See Swallow v. Emergency Med. of Idaho,* 138 Idaho 589, 595 n.1, 67 P.3d 68, 74 (2003) ("this Court has not adopted the *Daubert* test for admissibility"). The *Daubert* standards of whether the theory can be tested and whether it has been subjected to peer-review and publication have been applied, but the Court has not adopted the standard that a theory must be commonly agreed upon or generally accepted."

72

show that she could only have gotten MRSA and PA from PCRC. Instead, as this Court stated, Ms. Nield only needed to show proximate cause, "[b]y a 'chain of circumstances from which the ultimate fact required to be established is reasonably and naturally inferable." *Weeks, supra,* 143 Idaho at 849, 153 P.3d 1185. (quoting, *Sheridan v. St. Luke's Reg'l Med. Ctr.,* 135 Idaho 775, 785, 25 P.3d 88, 98 (2001)).

The District Court improperly weighed the evidence when it discounted the opinions of Mr. Gerber and Ms. Fredericks, as well as Ms. Nield's own observations establishing the "**chain of circumstances**" sufficient to defeat summary judgment. Mr. Gerber and Ms. Frederick concluded, from their review of all of the medical records, state and federal regulations, PCRC's own records and the reports from DHW, that Ms. Nield contracted MRSA and PA due to PCRC's failure to follow infection control. R., pp. 640-653; pp. 1096-1106. Mr. Gerber and Ms. Frederick also concluded PCRC failed to adequately train its medical care providers, and failed to provide an adequate number of staff, which resulted in Ms. Nield contracting MRSA and PA from PCRC.

It must be remembered that Ms. Nield's doctors required PCRC to perform daily wound assessments. PCRC did not comply. PCRC did them weekly and also incompetently as they failed to properly document the size of the wound, what the wound looked like, and any other identification of the wound in the skin assessments/ulcer sore sheets. PCRC completely stopped documentation of two of the wounds on September 18, 2007, and the largest wound on October 22, 2007, a few weeks prior to Ms. Nield testing positive for MRSA and PA. R., pp. 603-639; pp. 648-653; p. 678; pp. 1027-1029; pp. 1095-1097; pp. 1098-1106. Furthermore, PCRC was found to be in violation of state and federal standards by DHW on January 24, 2008. DHW found that the staff at PCRC could not demonstrate proper infection control policies and procedures when handling patients that had MRSA. R., pp. 671-673; p. 750; pp. 923-927; p. 931. All of Ms. Nield's experts – Dr. Selznick, Ms. Frederick and Mr. Gerber considered these facts in reaching their respective opinions.

Additionally, there was undisputed evidence Ms. Nield was housed in a room next to a resident that had MRSA and that another resident was infected with PA. R., p. 921; p. 931; p. 973. Ms. Nield also testified that she witnessed nurses exiting the MRSA patient's room without any gloves on or washing their hands. R., pp. 971-72. These facts are sufficient to preclude summary judgment, as they establish the chain of circumstances that may lead a jury to conclude Ms. Nield was infected with MRSA and PA due to PCRC's conduct and omissions. The records establishes [sic] Ms. Nield's case was and is appropriate for a jury to resolve, not the District Court.

D.      MS. NIELD IS ENTITLED TO ATTORNEY'S FEES AND COSTS ON APPEAL.

Ms. Nield is entitled to attorney's fees and costs under Idaho Code §12-121 and Idaho Appellate Rules 40 and 41. Idaho Code § 12-121 and I.A.R. 41 allow for the award of attorney's fees and costs in a civil action where a matter

73

was defended frivolously, unreasonably and without foundation. I.A.R. 40 allows for the award of costs to the prevailing party on appeal. Ms. Nield submits that PCRC was clearly not entitled to summary judgment, and that the District Court's grant of summary judgment was unreasonable and without foundation. This case is, unequivocally, the epitome of a case that should have been presented to the jury for resolution, not the District Court. For these reasons, Ms. Nield is entitled to an award of attorney's fees and costs on appeal.

## CONCLUSION

Based on the foregoing, Ms. Nield respectfully requests that the Court reverse the District Court's grant of summary judgment, and remand the case to the District Court for further proceedings.

HORTON, J., dissenting.

I entirely concur with the legal reasoning contained in Justice Eismann's dissent. I write separately because I am unable–perhaps it is more accurate to say that I am unwilling–to reach Justice Eismann's conclusion as to our colleagues' motives, i.e., that the majority's decision is "based solely upon whom they want to win or lose" and that the majority's description of our holding in *Weeks v. E. Idaho Health Servs.*, 143 Idaho 834, 153 P.3d 1180 (2007) is motivated by a desire "to find a way to reverse the district court so that Ms. Nield can prevail in this action." Thus, I would characterize the majority's description of the perceived limitations of *Weeks* as "mistaken" or "inaccurate," rather than suggesting that the majority is deliberately "untruthful." In my view, the majority's error is not the product of a preference for one party over the other; rather, the majority's error is a failure to observe the limitations upon an appellate court when reviewing a trial court's discretionary decision.

The majority correctly states and applies our rule that the determination of the admissibility of evidence offered "in support of or in opposition to a motion for summary judgment is a threshold question to be answered before applying the liberal construction and reasonable inferences rule to determine whether the evidence is sufficient to create a genuine issue for trial." *J-U-B Engineers, Inc. v. Sec. Ins. Co. of Hartford*, 146 Idaho 311, 314-15, 193 P.3d 858, 861-62 (2008) (citing *Gem State Ins. Co. v. Hutchison*, 145 Idaho 10, 13, 175 P.3d 172, 175 (2007)). However, although the majority correctly states the standard of review governing this threshold question of the admissibility of evidence, I believe that it has failed to apply that standard in deciding this case.

Before turning to the somewhat mechanical process of applying the standard of review of discretionary decisions, I think that a few words about the nature of discretionary decisions are in order. A discretionary decision is one where reasonable people may consider the facts and applicable law and reach differing conclusions. Thus, in the context of sentencing—another discretionary function exercised by trial courts—this Court has stated "where reasonable minds might differ, the discretion vested in the trial court will be respected, and this Court will not supplant the views of the trial court with its own." *State v. Windom*, 150 Idaho 873, 875, 253 P.3d 310, 312 (2011) (quoting *State v. Broadhead*, 120 Idaho 141, 145, 814 P.2d 401, 405 (1991), *overruled on other grounds by State v. Brown*, 121 Idaho 385, 825 P.2d 482 (1992)).

This characterization of discretionary decisions is scarcely unique to this state. As an encyclopedia of American law explains, "[a] determination that a trial court abused its discretion involves far more than a difference in judicial opinion." 5 Am. Jur. 2d *Appellate Review* § 623 (2007) (citing *Saffian v. Simmons*, 727 N.W.2d 132, 135 (Mich. 2007)). The preeminent legal dictionary provides a similar description: "*Judicial and legal discretion*. These terms are applied to the discretionary action of a judge or court, and mean discretion bounded by the rules and principles of law, and not arbitrary, capricious, or unrestrained. It is not the indulgence of a judicial whim, but the exercise of judicial judgment...." Black's Law Dictionary 419 (5th ed. 1979).

Our recognition that there are categories of judicial decisions broadly falling under the rubric of discretionary decisions for which there may be more than one "right answer" has led this Court to focus on the process, rather than the result, when reviewing a trial court's decision on a matter committed to its discretion. Thus, this Court has stated:

> We have long held that the appellate court should not substitute its discretion for that of the trial court. Implicit in this principle is the truism that the appellate court should not simply focus upon the results of a discretionary decision below, but rather upon the process by which the trial court reached its discretionary decision.

*Quick v. Crane*, 111 Idaho 759, 772, 727 P.2d 1187, 1200 (1986).

As the intensity of Justice Eismann's dissent suggests, whether evidence should or should not be admitted can be the object of substantial disagreement between reasonable people. Perhaps this is the reason that this Court has frequently stated that the trial courts have "broad discretion" in deciding whether or not evidence is admissible. *See, e.g., Warren v. Sharp*, 139 Idaho 599, 605, 83 P.3d 773, 779 (2003) (citing *State v. Howard*, 135 Idaho 727, 731, 24 P.3d 44, 48 (2001)). Given the extensive discussion of the decision by both the majority and Justice Eismann, it is worth noting that *Weeks* explicitly recognized that this "broad discretion" extends to the determination of the admissibility of expert testimony. *Weeks*, 143 Idaho at 837, 153 P.3d at 1183 (citing *Warren*, 139 Idaho at 605, 83 P.3d at 779).

It is against this backdrop that I turn to the standard of review which (I feel obligated to reiterate) focuses on *how* the trial judge reached the decision, *not* what that decision was:

> "A trial court does not abuse its discretion if it (1) recognizes the issue as one of discretion, (2) acts within the boundaries of its discretion and applies the applicable legal standards, and (3) reaches the decision through an exercise of reason." *Johannsen v. Utterbeck*, 146 Idaho 423, 429, 196 P.3d 341, 347 (2008).

76

*Martin v. Smith*, 154 Idaho 161, 163, 296 P.3d 367, 369 (2013).

This appeal from the grant of summary judgment turns upon the single issue[11] of whether the district court erred when, in the district judge's words, he "evaluated the affidavits submitted by the Plaintiff's experts and determined the causation analyses offered were not based on valid and reliable principles or methodology, and, therefore, unhelpful to the trier of fact." If the final clause were not clear enough, the district court expressly stated that this decision was predicated upon its analysis under Rule 702 of the Idaho Rules of Evidence.

The majority does not suggest that the district court failed to recognize this decision was one of discretion. Given the district court's extensive discussion of *Weeks*, which as previously noted identified the admissibility of expert opinion as committed to the broad discretion of the trial court, and the extensive discussion of the reasons it concluded that Ms. Nield's experts' affidavits failed to meet the requirement of I.R.E. 702, it is evident that the district court recognized that this was a discretionary call.

The second prong of the "three-part test" for abuse of discretion actually contains two discrete inquiries: whether the trial court "acted within the outer boundaries of its discretion" and whether the trial court's decision was consistent "with the legal standards applicable to the specific choices available to it." *Magleby v. Garn*, 154 Idaho 194, 197, 296 P.3d 400, 403 (2013) (citing *Bailey v. Bailey*, 153 Idaho 526, 529, 284 P.3d 970, 973 (2012)). In the context of summary judgment proceedings, the district court faced a binary choice, to admit or exclude the opinions of causation proffered by Ms. Nield's experts.[12] Thus, the determination that the proffered opinions would not assist the trier of fact was within the range of legitimate, available options.

The second aspect of this second prong warrants more discussion, because this is where I believe the majority has first gone astray. The district court determined that the nature of Ms. Nield's lawsuit was such that it "required the testimony of experts to establish proximate cause of the injury suffered by the Plaintiff." Although Ms. Nield has not challenged this threshold legal determination by the trial court in her opening brief, the majority rejects the district court's considered analysis with the conclusion that "expert testimony is not necessary in determining

---

[11] Although the majority explains why it believes the district court erred in relying on Dr. Coffman's affidavit, Justice Eismann is correct in his observation that Ms. Nield has not raised this as an issue on appeal and that issue is not properly before this court.

[12] In a jury trial, the decision to admit evidence may also result in a court exercising a third option—to admit evidence subject to a limiting instruction.

how a particular person contracted the disease." I do not believe this statement by the majority accurately reflects the current state of jurisprudence in Idaho. In fact, in support of this threshold determination that expert testimony was necessary to establish causation, the district court cited our decision in *Coombs v. Curnow*, 148 Idaho 129, 219 P.3d 453 (2009), where we stated:

> Although the Idaho Rules of Evidence do not require expert testimony to establish causation in medical malpractice cases, such testimony is often necessary given the nature of the cases. Expert testimony is generally required because "the causative factors are not ordinarily within the knowledge or experience of laymen composing the jury."

148 Idaho at 140, 219 at 464 (quoting *Flowerdew v. Warner*, 90 Idaho 164, 170, 409 P.2d 110, 113 (1965)). *Coombs* is scarcely an outlier. Rather, it is consistent with other decisions from this Court indicating that causation of medical conditions may require the presentation of expert testimony. *See Swallow v. Emergency Med. of Idaho, P.A.*, 138 Idaho 589, 597-98, 67 P.3d 68, 76-77 (2003); *Cook v. Skyline Corp.*, 135 Idaho 26, 35, 13 P.3d 857, 866 (2000); *Evans v. Twin Falls County*, 118 Idaho 210, 214, 796 P.2d 87, 91 (1990). I cannot find error in the district court's determination that the cause of nosocomial infections is a matter "not ordinarily within the knowledge or experience of laymen."

As I can find no error in the district court's determination that causation in this case required the presentation of expert testimony, I turn to the critical decision by the district court that Ms. Nield's experts' affidavits failed to meet the requirements of I.R.E. 702.

The district court explained the standards that it applied in evaluating Ms. Nield's experts' opinions. As these standards are those which this Court has applied, the district court's articulation of the standards that it applied bears repeating:

> Rule 702 of the Idaho Rules of Evidence permits the admission of expert testimony only when
> > the expert is a qualified· expert in the field, the evidence will be of assistance to the trier of fact, experts in the particular field would reasonably rely upon the same type of facts relied upon by the expert in forming his opinion, and the probative value of the opinion testimony is not substantially outweighed by its prejudicial effect.
>
> *Ryan v. Beisner*, 123 Idaho 42, 47, 844 P.2d 24, 29 (Idaho Ct.App. 1992). Expert opinion which is speculative, conclusory, or unsubstantiated by facts in the record is of no assistance to the jury in rendering its verdict, and therefore is inadmissible. *Id.* at 46-47, 844 P.2d at 28-29. The testimony of an expert is speculative when it "theoriz[es] about a matter as to which evidence is not sufficient for certain knowledge." *Karlson v. Harris*, 140 Idaho 561, 565, 97

P.3d 428, 432 (2004). On the other hand, if an expert's reasoning or methodology underlying the opinion is scientifically sound and "based upon a 'reasonable degree of medical probability'" not a mere possibility, then the testimony will assist the trier of fact. *Bloching v. Albertson's, Inc.*, 129 Idaho 844, 846-47, 934 P.2d 17, 19-20 (1997) (quoting *Roberts v. Kit Mfg. Co.*, 124 Idaho 946, 948, 866 P.2d 969, 971 (1993)).

In deciding whether to admit expert testimony, a court must evaluate "the expert's ability to explain pertinent scientific principles and to apply those principles to the formulation of his or her opinion." *Ryan*, 123 Idaho at 46, 844 P 2d at 28. Admitting the expert's testimony depends upon the validity of the expert's reasoning and methodology, not his or her ultimate conclusion. *Id.* at 46-47, 844 P.2d at 28-29. As long as the principles and methodology behind a theory are valid and reliable, the theory need not be commonly agreed upon or generally accepted. *Weeks*, 143 Idaho at 838, 153 P.3d at 1184.

There is simply no error in the legal standards that the district court applied to its decision.

This brings me to the heart of my dissent: in my view, the majority simply does not agree with the reasons that the district court articulated for its decision that Ms. Nield's experts' opinions failed to meet the requirements of I.R.E. 702. In the memorandum opinion denying Ms. Nield's motion for reconsideration, the district court quoted from its earlier opinion, explaining:

Dr. Selznick "failed to identify all of the potential causes of symptoms, eliminating hypotheses in order to reach a conclusion as to the most likely cause." Instead, Dr. Selznick simply and improperly concluded

that because the Plaintiff was negative for MRSA and pseudomonas at the time of her admission to PCRC, but then tested positive for MRSA and pseudomonas prior to her discharge, then she must have contracted MRSA and pseudomonas while at PCRC. He does not address the other factors that could have been a substantial factor in causing the infections.

As such, this Court found "the validity of Dr. Selznick's reasoning and methodology regarding how the Plaintiff contract MRSA and pseudomonas [to be] without merit."

(district court citations to earlier opinion omitted).

This statement clearly reflects the district court's application of the legal principle we adopted in *Weeks*. Indeed, the district court's original decision not only cited, but quoted, our holding: "After identifying all of the potential causes of symptoms, the expert then engages in a process of eliminating hypotheses in order to reach a conclusion as to the most likely cause." *Weeks*, 143 Idaho at 839, 153 P.3d at 1185 (citing *Clausen v. M/V New Carissa*, 339 F.3d 1049, 1060 (9th Cir. 2003)). Significantly, the district court then further quoted *Weeks*: "When using

79

differential diagnosis, a district court is justified in excluding the expert's testimony if the expert fails to offer an explanation why an alternative cause is ruled out." *Id.* It is evident, at least to me, that the district judge viewed this case as presenting a situation where, in evaluating the admissibility of expert opinions, *Weeks* provided guidance as to the applicable legal standard governing the decision before him.

"Trial courts are not free to willfully disregard precedent from the appellate courts of this state." *State v. Hanson*, 152 Idaho 314, 325 n.6, 271 P.3d 712, 723 n.6 (2012) (citing *State v. Guzman*, 122 Idaho 981, 986, 842 P.2d 660, 665 (1992)). Aside from the failure to anticipate that this Court would overrule *Weeks sub silentio* (a decision, by the way, in which two-thirds of the present majority concurred), I cannot imagine what more the district judge could have done.

This case presented what I view as being a very close call for the district judge. Indeed, had I been in the position of the district judge, I likely would not have stricken Dr. Selznick's opinion. However, this Court should not reverse discretionary decisions when the trial court has identified the applicable legal standards governing a discretionary decision and rationally explained the manner in which those principles apply to the decision. To do so is to usurp the role of the trial court in exercising considered legal judgment.

Because reasonable minds can—and as is reflected in the sharply diverging views expressed in the majority and Justice Eismann's dissent, do in fact—disagree as to whether the district court properly concluded that Ms. Nield's experts failed to adequately address other potential causes of her MRSA and pseudomonas infections, this is an instance where the standard of review should have dictated affirmance. The district judge recognized the issue as a matter of discretion, the exclusion of the proffered opinions was within the boundaries of his discretion, he recognized and applied the governing legal principles as articulated by this Court, and he did so by an exercise of reason. For these reasons, I would affirm.